[No. A059312. First Dist., Div. One. Nov. 23, 1994.]

MARIE SMITH, Plaintiff and Appellant, v.
ACANDS, INC., et al., Defendants and Appellants.

COUNSEL

Bryce C. Anderson, Brayton, Gisvold & Harley and Philip A. Harley for Plaintiff and Appellant.

Kazan, McClain, Edises & Simon and David M. McClain as Amici Curiae on behalf of Plaintiff and Appellant.

St. Peter & Cooper, M. Armon Cooper, Jerome C. Dougherty Jennifer M. Ways, Sedgwick, Detert, Moran & Arnold, Roger D. Rizzo and Frederick D. Baker for Defendants and Appellants.

Michael J. Brady, Kathryn C. Curry, Ropers, Majeski, Kohn, Bentley, Wagner & Kane, Pillsbury, Madison & Sutro, Walter R. Allan and Robert C. Phelps as Amici Curiae on behalf of Defendants and Appellants.

OPINION

**STRANKMAN, P. J.**—August G. Smith (Smith) worked as a pipe fitter for 30 years, his work often exposing him to asbestos dust. Smith retired with good health in 1971 at the age of 67. Twenty years later, in 1991, Smith became ill and was diagnosed with the respiratory afflictions of asbestosis and asbestos-related pleural disease.

Smith and his wife, Marie, brought this action for damages against scores of asbestos manufacturers, asbestos installers, premises owners and others. Many defendants settled and trial proceeded with only two defendants. A jury returned a special verdict in favor of Smith and against ACandS, Inc. (ACandS), an asbestos insulation contractor, and Pacific Gas and Electric Company (PG&E), a utility company that built power plants using asbestos insulation.

The jury found ACandS and PG&E negligent and negligent per se for violating industry safety orders. ACandS was also held strictly liable for supplying asbestos products and PG&E held vicariously liable for hiring asbestos insulation contractors whose work created a peculiar risk of harm to others. Smith was awarded $590,100, including $400,000 in noneconomic damages. Apportioning fault for Smith's injuries, the jury allocated 10 percent to ACandS and 5 percent to PG&E. But the trial court declined to apply Civil Code section 1431.2, enacted as Proposition 51 in 1986 to require fault apportionment of noneconomic damages.

ACandS and PG&E appeal, challenging the sufficiency of the evidence, evidentiary rulings, jury instructions, and the court's refusal to allocate

noneconomic damages according to each defendant's fault. Smith died pending appeal, and his widow advances their cross-appeal disputing a nonsuit of claims for punitive damages and loss of consortium.

We find insufficient evidence of Smith's exposure to ACandS-installed asbestos insulation and reverse the judgment with directions to enter judgment in favor of ACandS. Instructional and evidentiary trial errors entitle PG&E to a new trial. The jury was improperly instructed to regard PG&E as presumptively negligent if it violated industrial safety orders setting standards for asbestos dust when there was no proof that PG&E was an employer subject to the safety orders. Prejudice attending the instructional error was exacerbated by the erroneous admission of expert testimony extrapolating excessive asbestos concentration levels from photographs of unspecified work sites at PG&E plants. These errors associated with proving PG&E's negligence per se prejudiced the trial as a whole. Additionally, a recent decision of our high court redefining the doctrine of peculiar risk mandates the conclusion that PG&E was improperly held vicariously liable for injuries to Smith, a hired contractor's employee. Since we reverse the judgment, we do not reach ACandS's and PG&E's demand for fault apportionment of noneconomic damages nor Smith's cross-appeal.

## I. Statement of Facts

### A. *The Nature of Asbestos*

Asbestos is a mineral which is fibrous once mined and extracted from rock. Asbestos' strength and heat resistance made it attractive for use in construction materials such as pipe insulation. The hazards of asbestos gradually became known, and it is now undisputed that long-term asbestos inhalation causes various diseases. Remaining for dispute, although peripheral to this appeal, is the question of when the health hazards of asbestos first became known. Smith maintains that the danger of asbestos exposure was medically confirmed in the 1930's. Defendants say the danger was not commonly understood until the 1970's.

### B. *Smith's Occupational Exposure to Asbestos*

Smith, born in 1904, began working as a pipe fitter at the Richmond shipyard in the 1940's during World War II, fitting and installing pipes on board ships. As a pipe fitter on ships, Smith worked near insulators and the air quality was sometimes "pretty bad." With the exception of a few years immediately after the war, Smith remained a pipe fitter until his retirement with good health at age 67 in 1971. During his 30-year career, Smith was

dispatched by his union and employers to work at various sites, laboring near asbestos insulators and handling asbestos gaskets when replacing pipes.

(1) *PG&E Jobsites*

In the early 1950's, Smith worked for a year and a half to two years on the construction of PG&E power plants in Pittsburg and Antioch. Smith also worked at those PG&E plants on projects in the early 1960's. Smith described the air at those power plants as "pretty nasty," with "a lot of stuff blowing in the air, dust and stuff, like asbestos stuff." In addition to working near insulators, Smith also put insulation on turbine pipes in his job as a pipe fitter.

A pipe fitter who worked alongside Smith at the Pittsburg PG&E plant in the early 1960's explained the close quarters shared with insulators and a pipe fitter's repeated exposure to asbestos insulation, since all steam pipes are insulated. At Pittsburg, insulation dust was visible in the air many times and, as a shop steward, the pipe fitter received weekly complaints from others about the dust.

A boilermaker who worked on the construction of the PG&E plants testified that asbestos insulation work was performed as soon as boilers and pipes were in place, and was carried on while pipe fitters and other trades people were nearby. The boilermaker likened the wind-swept asbestos materials to a "Kansas dust storm."

The boilermaker's testimony was corroborated by Wayne Kelly, an asbestos insulator employed in the construction of the PG&E Antioch plant. Kelly testified that he believed all insulation materials used at the Antioch plant contained asbestos and that asbestos dust floated in the air during construction. The insulators worked within five to ten feet of pipe fitters, and no workers were provided dust protective gear. Kelly had also worked at the PG&E Pittsburg plant and said the working conditions were similar to Antioch, and that the conditions at both plants remained unchanged through the early 1960's.

Kelly was shown photocopies of two black-and-white photographs depicting exposed pipes, scaffolding and floors splotched with white and asked if they represented work conditions at the PG&E Antioch plant during its construction in the late 1940's and early 1950's. Kelly responded that the pictures were "[v]ery representative of our particular trade work, and the mess we caused" and depicted the "general appearances" of insulation work. Another asbestos insulator, Robert Cuthbertson, testified that he worked on

the construction of the PG&E Antioch plant in the early 1950's and exhibits Nos. 32 and 33 accurately depict the "general working environment" at that time. Smith said exhibit No. 32 represented what the PG&E work sites looked like "at times" and that he worked in conditions "similar" to those depicted in exhibit No. 33.

An industrial hygienist, Kenneth Cohen, opined that working conditions represented in exhibits Nos. 32 and 33 would produce an asbestos level exceeding threshold limits established by an association of industrial hygienists in 1946 and promulgated as "maximum acceptable concentrations" in a California agency's industry safety orders from 1949 to 1964. Cohen also testified that asbestos is not visible at low concentrations so that sustained dust in the air following asbestos work indicates that the established limit was "exceeded dramatically."

### (2) ACandS Insulation at Jobsites

ACandS is an industrial insulation contractor.[1] ACandS supplies and installs insulation materials according to customer specifications. Evidence of Smith's exposure to ACandS supplied insulation materials was circumstantial, based largely on evidence that Smith and ACandS were employed at the same job sites.

The evidence focused on the Richmond refinery of Standard Oil (today's Chevron). Smith testified that he worked at the Standard Oil refinery, "probably close to ten times" from about 1947 through the late 1960's. Smith could not remember the names of any insulation companies on the jobs he worked at the Standard Oil refinery. A comparison of Smith's union dispatch slips and ACandS contract logs shows that, at most, ACandS installed insulation somewhere within the Standard Oil Refinery on two occasions when Smith was working at the refinery in 1959 and 1964. The maximum time ACandS and Smith both could be at the refinery was about four months. The refinery is "a mammoth," covering many acres and containing miles of piping.

In testifying about refinery work in general, Smith explained that he worked near insulation contractors, including "Armstrong," and the air in refineries was sometimes "pretty bad," with "stuff flying all over the air." Smith conceded that his work at the Standard Oil refinery was all or mostly

---

[1]ACandS's genesis lies as a unit of Armstrong Cork Company, an insulation manufacturer. In 1958, the unit became a subsidiary called Armstrong Contracting and Supply and then changed its name to ACandS in 1969 when it ended its affiliation with Armstrong Cork Company. For convenience, ACandS refers to both ACandS and Armstrong Contracting and Supply.

outdoors and that one does not inhale as much insulation materials as when working in enclosed areas, such as on board ships.

Robert Cantley, an ACandS insulator from 1957 to 1967, worked intermittently at the Standard Oil refinery on about six different projects. ACandS installed insulation to the specifications of Standard Oil. Cantley worked "right next" to pipe fitters as he installed asbestos installation. There was visible dust in the air; Cantley said one looked "like a snowman" from the dust.

## C. *Asbestos Diseases*

Asbestos inhalation causes various diseases. A pathologist testified that every asbestos disease is dose related: the more asbestos a person inhales, the higher the risk of disease. But while asbestos exposure heightens risk of disease, not everyone who is exposed to asbestos becomes diseased. However, a majority of those subjected to repeated, occupational asbestos exposure develop some disease. As a group, pipe fitters are at risk of developing asbestos diseases.

Asbestosis and asbestos-related pleural disease are respiratory, non-cancerous diseases caused by asbestos inhalation. Asbestos dust contains billions of microscopic asbestos fibers. Asbestosis develops when asbestos fibers are inhaled into the lung and cells of the body respond to the presence of the foreign matter by engulfing the fibers, leading to inflammation and formation of scar tissue. Healthy tissue is destroyed and replaced by scar tissue, disrupting the lung's function of oxygenating blood. Asbestos pleural disease is scarring of the pleura, or lung lining, caused by asbestos and is a condition separate from asbestosis, which concerns damage to lung tissue itself.

There is usually a minimum 15-year latency period from the time of first exposure until asbestos pleural disease is clinically identifiable. Likewise, asbestosis has an average minimum 20-year latency period before the disease is diagnosable. The latency period between exposure and diagnosis of an asbestos disease may be as long as 50 years. During "latency," the body is reacting to the inhaled fibers. By the time asbestosis is clinically manifest, there has already been damage to the lung inhibiting its function. Medical reports estimate that 20 percent to 50 percent of the lung is scarred and dysfunctional before asbestosis is discernible on X-rays.

## D. *Smith's Medical History*

Smith's treating physician since 1989, Dr. Ray, reviewed medical records and described Smith's various medical problems over the years—problems

both related and unrelated to asbestos exposure. Respiratory problems were first recorded in the late 1970's and early 1980's, when evidence of pleural disease affecting the lining of the lungs was noted by Smith's physician. Beginning in the mid-1980's, Smith suffered episodes of chronic obstructive pulmonary disease (C.O.P.D.) which Dr. Ray attributes to Smith's history of smoking and an "asthmatic like" feature of his lungs. Smith smoked for about 35 years before quitting in 1956.

Asbestosis and asbestos pleural disease were not diagnosed until a lung biopsy was performed in 1991. In December 1991, Smith was hospitalized with a respiratory infection. Dr. Ray was concerned that Smith might have mesothelioma (asbestos cancer) but a lung biopsy found no malignancy. However, the biopsy revealed asbestos pleural disease.

Dr. Ray characterized Smith's lung problems at the time of trial as moderately severe C.O.P.D., mild asbestosis, and severe asbestos pleural disease. A pathologist confirmed that Smith had pleural fibrosis caused by asbestos and asbestosis and testified that Smith had "an astronomical number" of asbestos bodies in his lung tissue. Smith had great difficulty breathing and was administered oxygen around the clock since his December 1991 hospitalization. Dr. Meyers, a pulmonologist called by PG&E, agreed with Dr. Ray's diagnosis of C.O.P.D., mild asbestosis, and asbestos pleural disease. But Dr. Meyers attributed Smith's symptoms to his C.O.P.D., and not the asbestos diseases.

## II. DISCUSSION

### A. *There Was Insufficient Evidence of Smith's Exposure to ACandS-Installed Asbestos Insulation*

ACandS submits there is insufficient evidence of causation because there is only slight circumstantial evidence that Smith was exposed to ACandS-installed asbestos materials, and any exposure was not a substantial factor in causing Smith's asbestos diseases. ■ We agree that the evidence of Smith's exposure to ACandS-installed materials is so slight and tenuous as to demand reversal and so do not address ACandS's other challenges to the judgment.

Under the most generous construction, the evidence shows only that ACandS might have installed insulation somewhere within the Standard Oil Refinery on two occasions when Smith might have been working at the refinery in 1959 and 1964. It is not certain that Smith and ACandS were ever at the refinery at the same time.

Smith was unable to say if he ever worked at the Standard Oil Refinery with ACandS insulators. Smith remembered fitting pipe at the refinery, but had no recollection of the dates he worked. Smith's union dispatch slips were used to provide this information, but the slips give an incomplete picture. The union dispatch slips show the dates Smith was dispatched to various jobs, but do not show the number of days he worked at each job site, or the last day of work. Smith was dispatched to the Standard Oil Refinery on two relevant occasions: November 4, 1958, and January 15, 1964. We do not know the completion date of these two projects, but can only say that Smith's November 1958 work ended by June 1959 and his January 1964 work ended by August 1964—these approximations derive from the fact that Smith was dispatched to other jobsites at those times. But the dates are wild approximations, because Smith occasionally had prolonged periods of time between jobs, the longest period being four or five months. The evidence simply does not establish the exact time Smith worked at the Standard Oil Refinery.

This failure of evidence becomes critical when combined with the inadequate proof of ACandS's presence at the refinery. Cantley, an ACandS insulator from 1957 to 1967, testified that he worked intermittently at the Standard Oil refinery on about six different projects. But proof of ACandS's presence at the refinery at specific times rested upon company business records, which showed that ACandS entered into contracts to work at the Standard Oil Refinery. As relevant here, two contract dates were February 11, 1959, and August 3, 1964. The contract dates are the dates of contract execution, not contract performance, and so do not establish when ACandS actually installed asbestos installation at the refinery.

If we assume that ACandS started work on the day of contract execution and continued indefinitely and that Smith worked without stopping between jobs, we find that ACandS and Smith both worked at the Standard Oil Refinery for four months,—February 11, 1959, to June 4, 1959, and August 3, 1964, to August 12, 1964. But assuming ACandS to begin work on the day of contract execution is at odds with common sense, and assuming Smith to work incessantly is at odds with his own testimony of occasional breaks between assignments. If we discard these assumptions, and we must, only conjecture could lead to a conclusion that Smith and ACandS were at the refinery at the same time. And nothing within reason could lead to the conclusion that Smith was anywhere near ACandS when it installed asbestos materials there. The Standard Oil Refinery is a sprawling complex—"a mammoth," in the words of one of Smith's witnesses.

The evidence of exposure to ACandS-installed asbestos materials outside of the Standard Oil Refinery is even thinner. In testifying about refinery

work in general, Smith said he worked near insulation contractors, including "Armstrong." Smith did not explain whether he meant ACandS (Armstrong Contracting and Supply Corporation) or the distinct entity of Armstrong Cork Company. This ambiguous and bare testimony cannot support a verdict against ACandS. Nor is the verdict supported by evidence highlighted on appeal that Cantley, an ACandS insulator, worked at PG&E's Antioch power plant in the early 1960's—a time at which Smith was also employed at the plant. Cantley testified that he worked at the plant, but could only "guess" that his work occurred "about the timeframe" of 1963 or 1964 and, most significantly, his work was on the smoke stack, not the main facility where Smith was employed.

We appreciate the difficulty of proving exposure to a particular defendant's products or activities in cases of latent diseases where memory-dulling decades can intervene between toxic exposure and prosecution of an action for damages. Nevertheless, even under the most lenient causation standards, there must be proof that the defendant's asbestos products or activities were present at plaintiff's work site. (E.g., *Lockwood* v. *AC & S, Inc.* (1987) 109 Wn.2d 235 [744 P.2d 605].) Here, only rank speculation, not reasonable inferences, could support a conclusion that Smith was exposed to ACandS-installed asbestos materials. Lacking proof of causation, all of Smith's claims against ACandS fail. ACandS's motion for judgment notwithstanding the verdict was wrongly denied.

B. *The Jury Was Erroneously Instructed That a Violation of Industrial Safety Orders Rendered PG&E Presumptively Negligent*

PG&E was found negligent per se for violation of California industry safety orders of 1947 through 1964 which set standards for the prevention of harmful exposure of employees to asbestos dust.[2] PG&E maintains that the trial court erred in admitting the safety orders and instructing on negligence per se, and that those errors also taint the jury's finding of general negligence.

A person is rebuttably presumed to have failed to exercise due care if "(1) He violated a statute, ordinance, or regulation of a public entity; [¶] (2) The violation proximately caused death or injury to person or property; [¶] (3) The death or injury resulted from an occurrence of the nature which the statute, ordinance, or regulation was designed to prevent; and [¶] (4) The person suffering the death or the injury to his person or property was one of the class of persons for whose protection the statute, ordinance, or regulation

---

[2]The safety orders were issued by the California State Department of Industrial Relations, Division of Industrial Safety.

was adopted." (Evid. Code, § 669, subd. (a).) Violation of safety orders promulgated under the authority of California's Labor Code, as here, is within the presumption accorded by Evidence Code section 669. (*Solgaard v. Guy F. Atkinson Co.* (1971) 6 Cal.3d 361, 366-367 [99 Cal.Rptr. 29, 491 P.2d 821].)

The pressing question is whether the safety orders were properly used to establish the liability of PG&E, a premises owner rather than an employer of Smith. PG&E says the admission was error, resting the crux of its assertion on the rule that Labor Code safety provisions and derivative safety orders may not be used in any personal injury or wrongful death action arising after April 1, 1972, except as between an employee and his own employer. (Lab. Code, § 6304.5; *Salinero v. Pon* (1981) 124 Cal.App.3d 120, 129-131 [177 Cal.Rptr. 204].) PG&E maintains that the action arose in 1991, the year Smith discovered his injury by being diagnosed with an asbestos disease. Smith says the action arose in the early 1950's, when Smith was exposed to asbestos at PG&E power plants. We have no need to decide when this action "arose" within the meaning of Labor Code section 6304.5 which precludes use of safety orders in third party actions because the jury was improperly instructed to rely upon the orders even under the law preexisting the statute's passage.

Under preexisting law, "employer" was defined to include "every person having direction, management, control, or custody of any . . . place of employment" and "place of employment" meant any place where employment was carried on. (Stats. 1937, ch. 90, §§ 6302, 6304, p. 306.) Under these broad concepts, premises owners were sometimes found to be employers and held accountable under the Labor Code's safety standards for injuries sustained by an independent contractor's employee working on the premises. (See *Kuntz v. Del E. Webb Constr. Co.* (1961) 57 Cal.2d 100, 106-107 [18 Cal.Rptr. 527, 368 P.2d 127] [reviewing case law].) But Smith is mistaken in arguing that safety orders were "routinely" applied in construction negligence actions against owners.

Owners were obligated to comply with safety orders only if they were found to be a statutory employer with " 'direction, management, control, or custody of any . . . place of employment.' " (*Stanford v. City of Ontario* (1972) 6 Cal.3d 870, 877-878 [101 Cal.Rptr. 97, 495 P.2d 425].) While every premises owner has ultimate "control and custody" of his property, the statutory definition of "employer" was not applied with such literal breadth as to encompass every owner within its perimeters. (*Ibid.*) Instead, Labor Code safety regulations were applied to owners in limited situations, such as where independent contractors or their employees were injured by the

owner's operation of machinery, direction of work performance, or creation of dangerous conditions. (See *Kuntz* v. *Del E. Webb Constr. Co.*, *supra*, 57 Cal.2d at pp. 106-107 [reviewing case law].) Owners were not held accountable for dangerous conditions created by an independent contractor's work or the contractor's use of hazardous equipment and materials. (E.g., *Deorosan* v. *Haslett Warehouse Co.* (1958) 165 Cal.App.2d 599, 616-618 [332 P.2d 422].)

Here, Smith seeks to subject PG&E to safety orders establishing maximum acceptable concentrations of asbestos dust. But it is undisputed that the dust was caused by insulation contractors' installation of asbestos materials, not by any activities of PG&E. Smith says PG&E is nevertheless bound by the safety orders because it "took an active role in supervising the various aspects of construction and maintenance" of the power plants. As evidence of PG&E's "close supervision" of insulation work, Smith only points to specifications issued by PG&E in soliciting proposals for insulating the Pittsburg power plant. The specifications provide that the contractor is to comply with all safety regulations and eliminate hazards to its own and other workers and that all work is subject to general supervision and inspection by PG&E. Apparently, Smith believes that PG&E's expressed interest in compliance with safety orders and supervision of construction rendered it a statutory employer responsible for furnishing a safe place of employment under the Labor Code's dictates. Smith is wrong.

The Labor Code "should not be construed as meaning that, where a general contractor or owner of premises does nothing more with respect to the work done by an independent contractor than exercise general supervision and control to bring about its satisfactory completion, it is his responsibility to assure compliance with all applicable safety provisions of the code and regulations issued thereunder, including those relating to the manner in which the independent contractor performs operative details of the work not affecting its ultimate result." (*Kuntz* v. *Del E. Webb Constr. Co.*, *supra*, 57 Cal.2d at p. 106.) ▆ The "right to see that work is satisfactorily completed does not impose upon one hiring an independent contractor the duty to assure that the contractor's work is performed in conformity with all safety provisions. . . ." (*Van Arsdale* v. *Hollinger* (1968) 68 Cal.2d 245, 257 [66 Cal.Rptr. 20, 437 P.2d 508], citation omitted.) As a matter of law, general supervision of an independent contractor's work, without direction of operative detail, does not make an owner a statutory employer bound by safety regulations of the Labor Code. (*Stanford* v. *City of Ontario*, *supra*, 6 Cal.3d at p. 878.) And an owner's demand that the independent contractor comply with safety regulations does not make the owner a guarantor that the regulations are, in fact, respected. (See *ibid.*)

 There is no evidentiary basis for regarding PG&E as a statutory employer bound by the safety orders and thus the jury was improperly instructed to find PG&E presumptively negligent if it violated the orders. The court did not even charge the jury with determining if PG&E was a statutory employer, but effectively directed the jury to regard defendants as employers.

Smith has anticipated that we might fault the instruction on negligence per se, and argues that the judgment against PG&E can be affirmed on his theory of general negligence. We are unpersuaded. In the special verdict, the jury first determined, on the basis of an improper instruction, that PG&E violated safety orders and was negligent as a matter of law. Only after making that determination was the jury asked if PG&E was generally negligent in "the management or maintenance of the premises . . . ." It is inconceivable that this latter determination of general negligence was unaffected by the court's error in submitting the negligence per se claim to the jury. (See *Kuntz* v. *Del E. Webb Constr. Co., supra,* 57 Cal.2d at pp. 105-107 [reversing judgment where sufficient evidence of general negligence but improper instructions on negligence per se].) Moreover, as discussed immediately below, an evidentiary error associated with this instructional error demands reversal of the judgment against PG&E.

C. *Expert Testimony Extrapolating Asbestos Concentration Levels From Photographs of Working Conditions Was Improperly Admitted*

 PG&E claims the trial court erred in admitting photographs representing work conditions at the Antioch plant and permitting expert testimony extrapolating the amount of asbestos dust from the scenes depicted.[3] We are satisfied that a sufficient foundation was laid to permit introduction of the photographs in evidence, but agree that the expert's testimony should have been excluded.

 As to authentication of the photographs, we appreciate the force of PG&E's argument that no one testified to the exact dates and places portrayed. However, several witnesses who worked at the Antioch plant testified that the pictures represented working conditions there during its construction in the early 1950's. On this record, we cannot say the trial court abused its discretion in admitting the photographs as illustrative evidence.

 The court's error lies not in the initial acceptance of the photographs in evidence, but in permitting an expert to rely upon them in opining

---

[3]Smith says PG&E failed to object to the proferred evidence, thus waiving its challenge on appeal. In fact, PG&E repeatedly objected to the photographs and the expert's testimony.

that asbestos dust levels were excessive. As discussed earlier, Cohen, an industrial hygienist, said working conditions represented in the photographs would produce an asbestos level exceeding threshold limits established by an association of industrial hygienists and issued in the industry safety orders Smith used to establish negligence per se. More specifically, Cohen testified that asbestos levels would be between five and twenty-five fibers per cubic centimeter during work activities producing asbestos residue as depicted in the pictures. His opinion was based on air monitoring done in other situations where "asbestos residue has appeared similarly." Cohen proceeded to testify that if working conditions at PG&E power plants in the 1960's were "essentially the same" as those revealed in the photographs from years earlier, then asbestos concentration levels were exceeded at that time as well.

An expert's testimony must be based on matters upon which he may reasonably rely. (Evid. Code, § 801.) Conjecture and speculation provide no proper basis for an expert's opinion. (*Hyatt* v. *Sierra Boat Co.* (1978) '79 Cal.App.3d 325, 338 [145 Cal.Rptr. 47].) Reliance on old black-and-white photographs to deduce specific concentration levels of asbestos in the air is highly suspect. As Cohen himself testified, the scientific standard for measuring asbestos levels is to filter air through a membrane and use an electron microscope to magnify the membrane to count the retained asbestos fibers. Even that technique permits only an estimate of asbestos levels and a great deal of variability attends the results. We are unpersuaded that one can extrapolate accurate asbestos concentration levels from the messy appearance of asbestos materials at a work site. Certainly, no foundation was laid that industrial hygienists reasonably rely upon photographs to assess asbestos levels.

Smith argues that any error in admitting Cohen's extrapolations from the photographs was harmless because that testimony was insignificant and cumulative when weighed with his testimony as a whole. It is true that Cohen also testified, without objection, that asbestos is not visible at low concentrations, so that witness descriptions of sustained dust in the air following asbestos work indicates that the established safety limit was "exceeded dramatically." However, the quantification of asbestos concentration levels as between five and twenty-five fibers per cubic centimeter was based exclusively upon the photographs and was devastating evidence. In any event, expert testimony of asbestos levels violative of industry safety standards coupled with an erroneous charge to the jury that PG&E was bound by the safety standards was clearly prejudicial.

D. *A Landowner Who Hires Several Independent Contractors to Work Simultaneously on a Project on Its Land Is Not Vicariously Liable Under the Doctrine of Peculiar Risk for the Negligence of Any of the Hired Contractors Which Injures Any of the Contractors' Employees*

In addition to finding PG&E itself at fault for Smith's asbestos injuries, the jury also found PG&E vicariously liable under the peculiar risk doctrine. ■ As our Supreme Court recently explained, "[u]nder the peculiar risk doctrine, a person who hires an independent contractor to perform work that is inherently dangerous can be held liable for tort damages when the contractor's negligent performance of the work causes injuries to others." (*Privette* v. *Superior Court* (1993) 5 Cal.4th 689, 691 [21 Cal.Rptr.2d 72, 854 P.2d 721].) A peculiar risk is "neither a risk that is abnormal to the type of work done, nor a risk that is abnormally great; it simply means ' "a special, recognizable danger arising out of the work itself." ' [Citations.]" (*Id.*, at p. 695.) Here, liability hinged on PG&E's hiring asbestos installation contractors when it knew, or should have known, that the work was likely to create a peculiar or special risk of bodily harm to others on the premises.

Following trial and entry of judgment in this case, our Supreme Court issued a decision narrowing the boundaries of the doctrine of peculiar risk. In *Privette* v. *Superior Court, supra*, 5 Cal.4th 689, 692, 702, the court reversed judgment in favor of a roofing contractor's employee who sued a landowner for injuries from falling off a ladder while tarring the landowner's roof. The court observed that, originally, "the doctrine of peculiar risk made a landowner liable to innocent bystanders or neighboring property owners who were injured by the negligent acts of an independent contractor hired by the landowner to perform dangerous work on his or her land. . . . [¶] Gradually, the peculiar risk doctrine was expanded to allow the hired contractor's employees to seek recovery from the nonnegligent property owner for injuries caused by the negligent contractor." (*Id.*, at p. 696.) The court renounced that expansion. In explaining its disavowal of the expanded doctrine of peculiar risk which encompassed injured employees of a hired contractor, the court said the expanded doctrine frustrated goals of workers' compensation statutes which provide benefits to injured workers, and the broad extension of the doctrine was inconsistent with the majority view. (*Id.*, at pp. 701-702.)

Smith recognizes the significance of *Privette*, but argues that it does not apply retroactively and does not prevent tort recovery against nonnegligent landowners by a hired contractor's employee who is injured by the negligence of *another* contractor working on the premises. On the first point,

Smith's argument against retroactivity has recently been rejected by the Fifth District. (*Owens* v. *Giannetta-Heinrich Construction Co.* (1994) 23 Cal.App.4th 1662 [29 Cal.Rptr.2d 11].) We, too, find no reason to depart from the usual rule that judicial decisions are given retroactive effect. Our Supreme Court has reaffirmed the basic principle of retroactivity of judicial decisions, even when those decisions mark a clear break with established tort law. (*Newman* v. *Emerson Radio Corp.* (1989) 48 Cal.3d 973, 978-993 [258 Cal.Rptr. 592, 772 P.2d 1059].)

Exceptions to the rule of retroactivity are rare, and the strongest ground for creating an exception is the reliance of parties on the preexisting state of the law. (*Newman* v. *Emerson Radio Corp.*, *supra*, 48 Cal.3d at pp. 986, 988-991.) While Smith undoubtedly relied on the expanded doctrine of peculiar risk, his reliance was as a litigant pleading one of several possible causes of action, not as an individual conducting his affairs. Reliance of the former nature is less compelling and less demanding of an exception to the general rule of retroactivity. (*Id.*, at pp. 989-990.) A litigant's reliance on preexisting law when fashioning his lawsuit is undermined by every change in the law and, while unfortunate, is not a special circumstance warranting deviation from the rule of retroactivity. Nor are we persuaded that any other factors preclude retroactive application of *Privette* in this case. As the Fifth District explained, *Privette*'s purpose in correcting inequities caused by the expanded doctrine of peculiar risk would be frustrated by delayed use of the new rule and retroactive application of *Privette* will not necessitate a significant number of retrials or otherwise disrupt the administration of justice. (*Owens* v. *Giannetta-Heinrich Construction Co.*, *supra*, 23 Cal.App.4th at pp. 1670-1671.)

Remaining is the question posed by Smith as to whether *Privette* bars all peculiar risk claims by employees of any contractor working on the premises, or only the claims of employees of the negligent contractor whose acts injured the worker. As a practical matter, it is not clear that Smith's employer was free of negligence in Smith's exposure to asbestos installed by other contractors, since Smith's own employer bears some responsibility in providing a safe workplace. Nevertheless, as submitted to the jury, the issue was whether PG&E was vicariously liable for the negligence of insulation contractors—not Smith's pipe fitting employer.

We conclude that a landowner that hires several independent contractors to work simultaneously on a project on its land is not vicariously liable under the doctrine of peculiar risk for the negligence of any of the hired contractors which injures any of the contractors' employees. *Privette* marks a return to the "original form" of the doctrine of peculiar risk: a landowner

is liable to innocent bystanders and neighboring property owners injured by a hired contractor's negligent performance of dangerous work on the land. (*Privette* v. *Superior Court, supra,* 5 Cal.4th at p. 696.) A hired contractor's employee is not a bystander, whether judged in relation to his own work or in relation to another contractor's activities on a joint project.

While the many facets of *Privette*'s reasoning do not all apply with equal force to this situation of a hired contractor's employee injured by another contractor's negligence, a compelling consideration is common to both *Privette* and this case—workers' compensation. Whether a contractor's employee is injured on the job by the acts of his own employer or another contractor, the employee recovers workers' compensation benefits. Landowners hiring contractors indirectly pay the cost of workers' compensation coverage, and permitting tort recovery against landowners under the doctrine of peculiar risk would unfairly subject them to multiple costs for a single injury for which they are not personally at fault. (*Privette* v. *Superior Court, supra,* 5 Cal.4th at p. 699.) Imposing vicarious liability for tort damages on a landowner who hires independent contractors for specialized work would penalize those who hire skilled experts to perform dangerous work rather than assigning such activity to their own inexperienced employees. (*Id.,* at p. 700.) Furthermore, permitting tort recovery in this situation would give contractors' employees "an unwarranted windfall" by exempting "a single class of employees, those who work for independent contractors, from the statutorily mandated limits of workers' compensation. . . ." (*Id.,* at p. 700, citations omitted.)

Significantly, in a case cited with approval in *Privette* v. *Superior Court, supra,* 5 Cal.4th at page 698, the Massachusetts Supreme Court denied recovery under the peculiar risk doctrine for injuries sustained by a contractor's employee from the negligence of *any* contractor. (*Vertentes* v. *Barletta Co., Inc.* (1984) 392 Mass. 165 [466 N.E.2d 500, 501-504].) In *Vertentes,* a highway worker was struck by a passing truck while removing negligently placed orange marker barrels. (*Id.,* at p. 501.) It was uncertain which of several contractors on the construction site had improperly placed the barrels, the injured worker's employer or another contractor. (*Id.,* at p. 501.) The Massachusetts Supreme Court, while not directly addressing the issue, was apparently unimpressed with the proposed distinction between injuries sustained from the negligence of the injured worker's own employer and injuries caused by another contractor's negligence. The court was impressed by considerations of workers' compensation law and policy, and denied recovery on several of the same bases motivating our own Supreme Court. (*Id.,* at p. 503; cf. *Privette* v. *Superior Court, supra,* 5 Cal.4th at pp. 699-700.) We, too, reject the proposed distinction and conclude that a

landowner that hires several independent contractors to work simultaneously on a project on its land is not vicariously liable under the doctrine of peculiar risk for the negligence of any of the hired contractors which injures any of the contractors' employees.

E. *The Trial Court Properly Denied PG&E's Motion for Judgment Notwithstanding the Verdict Given Sufficient Evidence of PG&E's Negligence*

We have concluded that the judgment against ACandS must be reversed for insufficiency of evidence and the judgment reversed against PG&E insofar as it was based on claims of negligence per se and peculiar risk vicarious liability. We have also found that instructional and evidentiary trial errors associated with proving PG&E's negligence per se prejudiced the trial as a whole and preclude us from affirming the judgment on the jury's finding of general negligence. But PG&E has yet another challenge to the jury findings of liability, and maintains that there is insufficient evidence of its negligence. PG&E briefly argues that its motion for judgment notwithstanding the verdict was erroneously denied, citing a paucity of evidence of its knowledge of asbestos's health hazards which rendered Smith's injuries unforeseeable.

We have reviewed the entire record, and are satisfied that there was sufficient evidence to find PG&E negligent. While there was no direct evidence that PG&E knew asbestos's dangers, the jury could conclude that PG&E should have foreseen the dangers given publication of various medical and industrial studies of asbestos diseases and promulgation of industrial safety standards and that PG&E breached its duty to exercise ordinary care in the management of its premises by failing to hire careful and competent insulators or to take other reasonable precautions. The matter was for the jury, and properly submitted to them. We have no power to substitute our own deductions. (*Bowers* v. *Bernards* (1984) 150 Cal.App.3d 870, 874 [197 Cal.Rptr. 925].) However, as indicated above, we must reverse the judgment against PG&E in its entirety, and the question of PG&E's general negligence will be the subject of a new trial.

F. *Given Reversal of Judgment, We Do Not Address PG&E's Damages Argument Nor Smith's Cross-appeal*

Having found that the judgment must be reversed, we have no opportunity to address application of Civil Code section 1431.2, enacted as Proposition 51 in 1986 to require fault apportionment of noneconomic damages. While we recognize the importance of the issue, and appreciate the efforts of the

parties and amici curiae in briefing the issue, any opinion we expressed on the matter would be obiter dictum, and thus pointless. For the guidance of the trial court, we note that the matter is now before our Supreme Court. (*Coughlin* v. *Owens-Illinois, Inc.* (1993) 31 Cal.App.4th 1633 [27 Cal.Rptr.2d 214], review granted Apr. 21, 1994 (S037837).)

Likewise, there is no need to reach Smith's cross-appeal of his nonsuited claims of punitive damages and loss of consortium by Smith's wife. These issues are placed "at large" for retrial upon remand. (*Lewis* v. *Upton* (1984) 151 Cal.App.3d 232, 236 [198 Cal.Rptr. 494].)

### III. DISPOSITION

The judgment is reversed and the cause is remanded for a new trial against PG&E. The trial court is directed to enter judgment in favor of ACandS. ACandS and PG&E shall recover costs on appeal.

Stein, J., and Dossee, J., concurred.