[No. G022599. Fourth Dist., Div. Three. Oct. 24, 2001.]

STACY GORDON et al., Cross-complainants and Appellants, v.
HAVASU PALMS, INC., Cross-defendant and Respondent.

## Counsel

Law Offices of Joseph A. Brajevich and Joseph A. Brajevich for Cross-complainants and Appellants.

Haight, Brown & Bonesteel, Roy G. Weatherup, Mark S. Lester, David W. Evans, Caroline E. Chan and Josephine M. Chow for Cross-Defendant and Respondent.

## Opinion

**O'LEARY, J.**—Stacy Gordon appeals from a judgment entered in favor of Havasu Palms, Inc. (Havasu), after the trial court granted Havasu's motion for summary judgment. Gordon argues the trial court erroneously granted summary judgment because there was a triable issue of material fact regarding (1) whether the assumption of risk defense was applicable because Havasu failed to properly design and maintain its airstrip; and (2) whether the conditions at Havasu caused or contributed to his airplane crash. We agree and reverse.

I

Gordon purchased a Piper Arrow airplane. A week later, he decided to fly to Lake Havasu to work on his boat, which he stored there, and to meet his niece and her husband for lunch. Melvin Gomez, Gordon's friend, found out Gordon was flying to Lake Havasu and asked if he could join him. Gordon agreed, and they decided they would fly to Las Vegas and the next morning fly to Havasu, a privately owned mobilehome park with an airstrip.[1] Gordon had never flown to Havasu or done anything to determine the airstrip's conditions, but he had seen the airstrip from a distance.

---

[1] The airstrip has a dirt surface and is approximately 2,200 feet long and 60 feet wide. There is rapidly rising terrain within a half-mile of the south end of the airstrip. The airstrip is not listed on either FAA (Federal Aviation Administration) or California Department of Aeronautics files and was not listed on any aeronautical chart.

Gordon and Gomez flew from John Wayne airport to Las Vegas and spent the night. The next morning, Gordon checked the airplane and the weather at Lake Havasu and departed from Las Vegas. Gordon began their descent approximately 15 miles from Havasu. Gordon told Gomez they were going to fly over the airstrip to make sure it was clear, circle to the left, and make their approach to the airstrip. Gordon stated the fly-over altitude was approximately 1,000 feet; Gomez, who was not a licensed pilot, said the fly-over altitude was between 800 and 900 feet. Gordon does not remember what happened after he began their descent.

Gomez stated the airplane started shaking. Gordon pushed a lever down, which was located on the dashboard between the two front seats. The airplane went down, and both Gordon and Gomez sustained serious injuries.

Dean Albin, an eyewitness to the crash, stated he was on the ground when he heard Gordon's airplane fly overhead. Albin said the engine was sputtering. He saw the airplane bank to the left at the beginning of the runway and then straighten out. After it straightened out, he observed the nose of the airplane go straight up, and the airplane "[fell] straight out of the sky."

Gomez and his wife sued Gordon for negligence and strict liability. Gordon and his wife, Elizabeth Gordon, filed a cross-complaint against Havasu for negligence arising from a statutory violation, negligence, premises liability, and loss of consortium. The Gomezes settled with Gordon. Havasu answered the cross-complaint, contending the airstrip did not cause or contribute to Gordon's accident, and the assumption of risk defense barred his claim. Havasu amended its answer, asserting it was immune under the recreational use statute.

Havasu filed a motion for summary judgment arguing (1) the primary assumption of risk defense barred Gordon's claim; (2) there was no evidence Havasu's airstrip caused or contributed to Gordon's accident; and (3) Havasu was immune under Civil Code section 846.

The trial court granted Havasu's motion for summary judgment. It concluded Havasu did not cause or contribute to Gordon's accident, and the primary assumption of risk defense barred Gordon's claim. The court did not rule on whether Havasu was immune under Civil Code section 846.

II

A "motion for summary judgment shall be granted if all the papers submitted show that there is no triable issue as to any material fact and that

the moving party is entitled to a judgment as a matter of law. In determining whether the papers show that there is no triable issue as to any material fact the court shall consider all of the evidence set forth in the papers . . . and all inferences reasonably deducible from the evidence . . . ." (Code Civ. Proc., § 437c, subd. (c).) ▮ A defendant "has met his or her burden of showing that a cause of action has no merit if that party has shown that one or more elements of the cause of action, even if not separately pleaded, cannot be established, or that there is a complete defense to that cause of action. Once the defendant . . . has met that burden, the burden shifts to the plaintiff . . . to show that a triable issue of one or more material facts exists as to that cause of action or a defense thereto." (Code Civ. Proc., § 437c, subd. (o)(2); *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 849 [107 Cal.Rptr.2d 841, 24 P.3d 493].) "There is a triable issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof." (*Aguilar v. Atlantic Richfield Co., supra,* 25 Cal.4th at p. 850, fn. omitted.)

▮ We review the trial court's granting of a summary judgment de novo. (*Vallely Investments v. BancAmerica Commercial Corp.* (2001) 88 Cal.App.4th 816, 821 [106 Cal.Rptr.2d 689].) The moving party's affidavits should be strictly construed and the opponent's affidavits liberally construed. (*Kolodge v. Boyd* (2001) 88 Cal.App.4th 349, 355 [105 Cal.Rptr.2d 749].) "[A]ny doubts about the propriety of granting the motion must be resolved in favor of the party opposing the motion. [Citations.]" (*Ibid.*)

*Assumption of Risk*

Although normally we would discuss whether there were triable issues of material fact on the causation issue before discussing the assumption of risk defense, we will discuss the defense first because its applicability turns on whether Havasu owed Gordon a duty. It is axiomatic a discussion of whether Havasu owes a duty to Gordon precedes a discussion of whether Havasu caused or contributed to Gordon's accident.

Gordon argues the trial court erroneously granted summary judgment on the ground of primary assumption of risk because Havasu owed him a duty to design and maintain the airstrip in a safe manner. He contends Havasu breached its duty because the airstrip had a 9:1 clearance approach instead of 20:1 (Cal. Code Regs., tit. 21, § 3542, subd. (e)), the airstrip had a landing area gradient of 2.3 percent which was in excess of the FAA allowable maximum of 2.0 percent, and Havasu did not have a permit to operate the airstrip (Pub. Util. Code, § 21663). We agree.

In *Knight v. Jewett* (1992) 3 Cal.4th 296, 299-300 [11 Cal.Rptr.2d 2, 834 P.2d 696], the Supreme Court addressed the proper application of the primary assumption of risk doctrine in light of its holding in *Li v. Yellow Cab Co.* (1975) 13 Cal.3d 804, 828-829 [119 Cal.Rptr. 858, 532 P.2d 1226, 78 A.L.R.3d 393], where it adopted the comparative fault system in place of contributory negligence. The court drew a distinction between primary and secondary assumption of risk. (*Knight v. Jewett, supra,* 3 Cal.4th at p. 308.) "In cases involving 'primary assumption of risk'—where, by virtue of the nature of the activity and the parties' relationship to the activity, the defendant owes no legal duty to protect the plaintiff from the particular risk of harm that caused the injury—the doctrine continues to operate as a complete bar to the plaintiff's recovery. In cases involving 'secondary assumption of risk'—where the defendant does owe a duty of care to the plaintiff, but the plaintiff encounters a known risk imposed by the defendant's breach of duty—the doctrine is merged into the comparative fault scheme, and the trier of fact, in apportioning the loss resulting from the injury, may consider the relative responsibility of the parties." (*Id.* at pp. 308, 314-315.) The question of whether the defendant owed a legal duty to protect the plaintiff from a particular risk of harm turns on the nature of the activity or sport in which the defendant is engaged and the relationship of the defendant and the plaintiff to that activity or sport. (*Knight v. Jewett, supra,* 3 Cal.4th at pp. 308, 313-315.) "[T]he question of the existence and scope of a defendant's duty of care is a legal question . . . and is an issue to be decided by the court, rather than the jury." (*Id.* at p. 313, italics omitted.)

Havasu, as the party moving for summary judgment, had the burden to establish the doctrine of assumption of risk was a complete defense to Gordon's cause of action for negligence. Therefore, under *Knight*, Havasu was required to show it did not owe Gordon a duty to design and maintain its airstrip in compliance with applicable regulations, and the primary assumption of risk defense barred Gordon's claim. Havasu failed to meet its burden.

At a minimum, Havasu owed Gordon a duty to design and maintain its airstrip in compliance with applicable regulations. Public Utilities Code section 21013 defines an airport as "*any* area of land or water which is used, or intended for use, for the landing and take-off of aircraft . . . ." (Italics added.) Public Utilities Code section 21663 provides "it is unlawful for . . . any person to operate an airport unless an appropriate airport permit required by rule of the [Department of Transportation] has been issued by the department and has not subsequently been revoked." California Code of Regulations, title 21, section 3542 provides, "As a minimum, the following items are required for a *permitted* airport: [¶] . . . [¶] (e) clear 20:1 approach surfaces to each end of the runway's primary surface or to its displaced

threshold . . . ." (Italics added.) Public Utilities Code section 21650.1 requires airports not open to the general public "shall be marked . . . with letters or symbol selected by the [Department of Transportation] to designate that the airport is not open to the general public."[2]

Havasu does not address Gordon's argument that it operated an unpermitted and defective airstrip. In fact, Havasu contends Gordon "miss[ed] the issue" because "[t]he issue in *this* assumption of the risk case was what [were] the risks inherent in the activity of flying a plane, not in the landing strip." (Italics added.) Havasu adds, "Common sense dictates that crashing is a risk inherent in flying a plane."

Havasu suggests *this* assumption of risk case is different from all others. It is not, and the issue in this case, like all other assumption of risk cases, is whether Havasu owed Gordon a duty. And while we agree crashing is a risk inherent in flying a plane, "it is thoroughly unrealistic to suggest that, by engaging in a potentially dangerous activity or sport, an individual consents to (or agrees to excuse) a breach of duty by others that increases the risks inevitably posed by the activity or sport itself, even where the participating individual is aware of the possibility that such misconduct may occur." (*Knight v. Jewett, supra,* 3 Cal.4th at p. 311.) As Havasu states, Gordon was aware of the risks in flying and was trained to deal with them. However, he did not consent to or agree to excuse Havasu's breach of its duty to design and maintain a safe airstrip.

It is undisputed that aircraft land on and take off from the Havasu airstrip. Therefore, the airstrip is an airport within the meaning of Public Utilities Code section 21013, and Havasu was required to obtain a permit to operate the airstrip. Consequently, Havasu owed Gordon a duty to design and maintain its airstrip in compliance with applicable regulations. (*Nally v. Grace Community Church* (1988) 47 Cal.3d 278, 292 [253 Cal.Rptr. 97, 763 P.2d 948] [intentional and negligent torts involve violation of legal duty imposed by statute, contract, or otherwise].)

*Causation*

 Gordon argues the court erroneously granted Havasu's motion for summary judgment because there were triable issues of material fact as to

[2]California Code of Regulations, title 21, section 3543, subdivision (a)(1)(B) provides airport markings for unpaved runways "shall include delineation of runway ends and, if applicable, displaced threshold bars. Additionally, an unpaved runway that is not open to the general public shall be marked with the letter 'R'. The 'R' shall be located adjacent to the runway as near as practical to either the runway mid-point or each end of the runway, and in a location that is not a hazard to aircraft operations. The 'R' shall be at least 20 feet in height and 11 feet in width. Line width shall be 30 inches. The marking shall be a color that provides contrast with the ground and it shall be kept in a clearly distinguishable condition."

whether Havasu's negligent design and maintenance of the airstrip caused or contributed to Gordon's accident. Specifically, he argues Havasu was negligent because there were mountains at the end of the airstrip which had a 9:1 clearance approach instead of 20:1 as required by California Code of Regulations, title 21, section 3542. He explains the shortened distance caused him to pull up the airplane too steeply and bank too steeply, which made the airplane engine stall. We agree there is a triable issue of fact.

To recover for negligence, the plaintiff must show the defendant owed the plaintiff a legal duty, that the defendant breached the duty, and that the breach was a cause in fact of the plaintiff's injuries. (*Ann M. v. Pacific Plaza Shopping Center* (1993) 6 Cal.4th 666, 673 [25 Cal.Rptr.2d 137, 863 P.2d 207].) A defendant's conduct is a cause in fact of the plaintiff's injury if it was a substantial factor in bringing about the injury. (*Mitchell v. Gonzales* (1991) 54 Cal.3d 1041, 1049, 1052-1054 [1 Cal.Rptr.2d 913, 819 P.2d 872].) However, " 'If the conduct which is claimed to have caused the injury had nothing at all to do with the injuries, it could not be said that the conduct was a factor, let alone a substantial factor, in the production of the injuries.' [Citation.]" (*Id.* at p. 1052.) The issue of causation is usually a question for the jury. (*Constance B. v. State of California* (1986) 178 Cal.App.3d 200, 207 [223 Cal.Rptr. 645].)

Havasu, in its motion for summary judgment, argued the sole cause of the accident was pilot error. It alleged no condition or characteristic at the airstrip caused or contributed to the accident. With its motion, it included affidavits from Robert S. Tymczyszyn, Jim Taylor, and Eugene N. Beliveau.

Tymczyszyn stated he was a professional pilot with over 30 years of flying experience. He reviewed the National Transportation Safety Board's (NTSB) report of the accident, photographs of the wreckage and crash site, Gordon's opposition to Havasu's motion for summary judgment and accompanying affidavits, and the parties' depositions. He also performed a site investigation of the airstrip and an actual flight simulation of the perceived flight profile leading up to the accident. He was familiar with airport design standards and the conditions at the airstrip. He concluded the cause of the accident was pilot error; Gordon's accident was caused by lack of familiarity with his new plane, lack of required planning, and lack of preparation. He stated the 20:1 clearance requirement in both the approach and departure ends of the runway "is for terrain clearance only and has nothing to do with preventing a pilot from feeling 'visually intimidated.' " He stated there is rising terrain south of the runway, but it is well beyond the end of the airstrip and there is no "box effect" created by the terrain. Because the procedure for landing at the airstrip is to land to the south, Gordon had the 20:1 clearance.

He stated Gordon never came close to the alleged 9:1 surface area because his airplane "contacted the ground less than a third of the way down the runway . . . ." Moreover, because Gordon was flying over the airstrip and would have been at a higher altitude than if he was in an actual approach to landing, the conditions of the airstrip would not come into play and did not cause or contribute to the accident.

Taylor declared he was a professional pilot with an extensive background in light aircraft operations and pilot evaluation. He reviewed the log books, the associated maps and charts, photographs of the wreckage, the aircraft wreckage, Gomez's deposition, the airplane's operating manual, the relevant FAA regulations, and the NTSB's report of the accident. He also performed a site investigation of the accident and an actual flight simulation of the perceived flight profile leading up to the accident. He stated he was familiar with airport design standards and the conditions at Havasu's airstrip. He concluded the cause of the accident was pilot error because Gordon did not become familiar with the available flight information, and he did not maintain control of the airplane.

Beliveau stated he was a pilot, flight instructor, FAA designated pilot examiner, and retired United States Air Force lieutenant colonel. He declared he was familiar with airport design requirements and the conditions at the airstrip. He concluded, "Based upon my evaluation of the accident site, as well as my knowledge, training, and expertise, it is my opinion that neither any condition nor characteristic of the Havasu Palms Resort or the landing strip caused or contributed to the accident."

Havasu showed there was an issue whether causation can be established. The burden shifted to Gordon to show a triable issue of one or more material facts existed on the issue of causation. He did so.

In support of his opposition, Gordon submitted two declarations, one from Gerald Dallas, an expert in airport development and operation, and another from J. Phillip Cline, a pilot with over 40 years of flying experience. Dallas stated he had over 30 years of experience in airport development and operation. He explained he reviewed the NTSB's report, Havasu's experts' opinions, witness statements, photographs of the Havasu facility, maps of the area, and FAA regulations. He stated the Code of Federal Regulations provides the "minimum acceptable approach/departure slope for an aircraft landing surface is 20:1." He explained the slope is measured by the "approach/departure surface that increases one foot in height for every twenty feet out longitudinally from the surface." He declared the FAA "considers any object which exceeds [this] standard[] as a hazard to air navigation

. . . ." He concluded, "In my expert opinion [the increased slope] constitutes an unassumed [*sic*] and increased risk to a pilot using the facility . . . ."

Cline stated he was familiar with FAA and California regulations and the conditions at the airstrip. Cline said the terrain rises rapidly within a half-mile of the runway and exceeds the FAA's and State of California's 20:1 requirement. He declared the terrain can be visually intimidating and may make the pilot feel boxed in. "When [a] pilot perceives that he may be running out of space, he may react by pulling up too steeply and banking too steeply in an attempted escape," which may result in a stall. Cline concluded "the rapidly rising terrain south of the runway that exceeds the acceptable 20:1 slope contributed to the accident by setting up a situation in which the pilot felt boxed in and reacted by pulling up too steeply and banking too steeply so as to cause the aircraft to stall and crash." Gordon's experts' opinions were sufficient to create a triable issue of fact.

Relying on *Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763 [107 Cal.Rptr.2d 617, 23 P.3d 1143], Havasu maintains Cline's declaration lacked evidentiary value because it was speculative and unsupported by evidence. (See also *Wanland v. Los Gatos Lodge, Inc.* (1991) 230 Cal.App.3d 1507, 1518 [281 Cal.Rptr. 890].) We disagree.

*Saelzler v. Advanced Group 400, supra,* 25 Cal.4th 763 is inapposite. There, the plaintiff was assaulted by three men in defendant's apartment complex. (*Id.* at p. 769.) At trial, the plaintiff's expert stated the plaintiff would not have been assaulted had the defendant provided daytime security and kept the apartment gates repaired and closed. (*Id.* at p. 771.) The court explained that because the plaintiff could not identify her assailants, she could not establish whether they were authorized to enter the apartment complex. (*Id.* at p. 776.) Therefore, the plaintiff's expert's opinion was speculative because the assailants may have been tenants and authorized to enter, in which case increased security measures would not have prevented her assault. (*Ibid.*) In short, there was no factual basis for the plaintiff's expert's opinion.

In contrast, here, Cline's opinion is supported by the record. Cline based his opinion on matters upon which a pilot reviewing an accident may reasonably rely: the NTSB report, witness statements, the declarations of Beliveau, Taylor, and Dallas, photographs of Havasu, and accident photos. (*Smith v. ACandS, Inc.* (1994) 31 Cal.App.4th 77, 93 [37 Cal.Rptr.2d 457] [expert's testimony must be based on matters upon which expert may reasonably rely], disapproved on another ground in *Camargo v. Tjaarda*

*Dairy* (2001) 25 Cal.4th 1235 [108 Cal.Rptr.2d 617, 25 P.3d 1096].) Cline stated the terrain rises rapidly within a half-mile of the runway and exceeds the FAA's and State of California's 20:1 requirement. He said the terrain can be visually intimidating, and it made Gordon feel boxed in and that caused him to bank too steeply and pull up too steeply. Cline stated he based his opinion, in part, on witness statements. For example, Albin, an eyewitness to the crash, said he saw the airplane bank to the left and the nose go straight up before it crashed. From these facts one could reasonably conclude the rapidly rising terrain at the end of the runway caused Gordon to pull up and bank too steeply. Cline's opinion was supported by the record and was not speculative.

*Immunity*

■ Havasu argues it is immune from liability under Civil Code section 846. As stated above, the court did not rule on this argument. However, because we may uphold the trial court's judgment if it is correct on any legal theory (*Vallely Investments v. BancAmerica Commercial Corp., supra,* 88 Cal.App.4th at p. 821), we will address the contention.

Civil Code section 846 provides, "An owner of any estate or any other interest in real property, whether possessory or nonpossesory, owes no duty of care to keep the premises safe for entry or use by others for any recreational purpose or to give any warning of hazardous conditions, uses of, structures, or activities on such premises to persons entering for such purpose . . . ."[3] There are "two elements as a precondition to immunity: (1) the defendant must be the owner of an 'estate or any other interest in real property, whether possessory or nonpossessory'; and (2) the plaintiff's injury must result from the 'entry or use [of the "premises"] for any recreational purpose.'" (*Ornelas v. Randolph* (1993) 4 Cal.4th 1095, 1100 [17 Cal.Rptr.2d 594, 847 P.2d 560].)

A leasehold interest is sufficient to trigger immunity under Civil Code section 846. (*Ornelas v. Randolph, supra,* 4 Cal.4th at pp. 1102-1103 [exceptionally broad definition of types of interest in real property which will trigger immunity]; *Callahan v. Martin* (1935) 3 Cal.2d 110, 118 [43 P.2d 788, 101 A.L.R. 871] [leasehold an estate in real property].) It is undisputed

---

[3]Under Civil Code section 846, a property owner is liable "(a) for willful or malicious failure to guard or warn against a dangerous condition, use, structure or activity; or (b) for injury suffered in any case where permission to enter for the above purpose was granted for a consideration other than the consideration, if any, paid to said landowner by the state, or where consideration has been received from others for the same purpose; or (c) to any persons who are expressly invited rather than merely permitted to come upon the premises by the landowner."

Havasu has a leasehold interest in the property on which Havasu and the airstrip are located. Therefore, the first element is met.

As for the second element, Civil Code section 846 provides, "A 'recreational purpose' . . . includes such activities as fishing, hunting, camping, water sports, hiking, spelunking, sport parachuting, riding, including animal riding, snowmobiling, and all other types of vehicular riding, rock collecting, sightseeing, picnicking, nature study, nature contacting, recreational gardening, gleaning, hang gliding, winter sports, and viewing or enjoying historical, archaeological, scenic, natural, or scientific sites."

Havasu says Gordon was engaged in three recreational activities because he was (1) flying, (2) going to fix his boat, and (3) going to meet his niece for lunch. We disagree. Gordon was already engaged in the activity of flying; he was not flying to Havasu for the recreational purpose of flying at Havasu. Similarly, he was not flying to Havasu to fix his boat. He decided to fly to Havasu only after he and Gomez decided to fly to Las Vegas so he would still have time to meet his niece for lunch. In fact, Gordon's boat was stored closer to the Lake Havasu airport than it was to Havasu's airstrip. The only recreational purpose here which could trigger immunity would be eating lunch at Havasu's restaurant.

Havasu cites *YMCA of Metropolitan Los Angeles v. Superior Court* (1997) 55 Cal.App.4th 22, 28-29 [63 Cal.Rptr.2d 612], for the proposition eating lunch is a recreational activity. In addressing the plaintiff's claim that eating was an essential activity and the YMCA's release clause, therefore, was an exculpatory adhesion contract, the court stated, "Although munching while socializing, shopping, or playing games is not a sporting activity like skiing or swimming, it is a recreational activity which, however pleasurable, is not essential." (*Id.* at pp. 28-29.) Although the YMCA court held "munching" is a recreational activity, it was not within the context of Civil Code section 846, and we do not find the reasoning persuasive.

Gordon correctly notes Civil Code section 846 does not list eating as a recreational purpose and no cases have held eating to be one. However, the phrase "recreational purpose" has been defined broadly based on the statute's use of the word "includes," which ordinarily indicates a term of enlargement rather than limitation. (*Ornelas v. Randolph, supra,* 4 Cal.4th at pp. 1100-1101.)

However broad a reading we give the phrase "recreational purpose," eating lunch in a restaurant is not a recreational purpose within the meaning of the statute. Eating is not an activity sufficiently similar to the ones listed

in the statute to be included. Although Civil Code section 846 includes picnicking as a recreational purpose, picnicking contemplates bringing food and eating at an outdoor location. It cannot be said going to a restaurant and buying food is similar, even if one were to eat outside. If eating were held to be a recreational purpose, a restaurant owner would be immune from liability to any customer who was injured while visiting the restaurant, unless one of the exceptions applied. The Legislature never intended to immunize a particular class of business—restaurant owners—from all liability.[4] (*Ornelas v. Randolph, supra,* 4 Cal.4th at p. 1106 [landowners broadly encouraged to allow *access* to their property].)

The judgment is reversed. Gordon shall recover his costs on appeal.

Bedsworth, Acting P. J., and Moore, J., concurred.

A petition for a rehearing was denied November 26, 2001, and respondent's petition for review by the Supreme Court was denied January 16, 2002.

---

[4]Because we decide Havasu was not immune under Civil Code section 846, we need not discuss whether one or more of the section's exceptions apply.