65 F.3d 175
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
John JAMES, Plaintiff-Appellant,
v.
UNITED STATES of America, Defendant-Appellee.
 No. 94-15156.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted March 15, 1995.
Decided Aug. 16, 1995.
 
 Before: FLETCHER, REINHARDT, and NOONAN, Circuit Judges.
 
 
 1
 MEMORANDUM*
 
 
 2
 Plaintiff John James appeals the district court's summary judgment dismissing his action against the United States under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. Sec. 2674. James seeks damages for injuries he sustained while performing work for an independent contractor at a U.S. Navy facility. Plaintiff argues that the government is directly liable for his injuries because the work involved peculiar risks and because the government retained substantial control over the details of the asbestos removal project. We affirm.
 
 FACTS & PRIOR PROCEEDINGS
 
 3
 The plaintiff suffered injuries when he fell through a hole in a catwalk while removing asbestos at a Navy facility. James' employer, Allied Technology Group, Inc. ("ATG"), contracted with the U.S. Navy to remove and dispose of asbestos at Hunters Point Annex. The contract made ATG responsible for site safety as follows:
 
 
 4
 The Contractor shall also be responsible for all damages to persons or property that occur as a result of the Contractor's fault or negligence, and shall take proper safety and health precautions to protect the work which may have been accepted under the contract.
 
 
 5
 * * *
 
 
 6
 In performing this contract, the Contractor shall provide for protecting the lives and health of employees and other persons, preventing damage to property, materials, supplies, and equipment....
 
 
 7
 The contract incorporated a Navy work plan, which ATG was required to follow. The work plan warned of the potential danger to workers imposed by asbestos removal from the Navy's tall tanks and required ATG to take special precautions:
 
 
 8
 Since some of the tanks are tall and the area is outdoors, and subject to winds blowing primarily from the west, extreme care shall be taken to protect workers from physical injuries due to the elements.
 
 
 9
 In addition, the contract required ATG to submit a post-award site safety plan for the Navy's approval. ATG's site safety plan required the use of safety belts near unguarded openings as follows:
 
 
 10
 Much of the work at site 10 will be performed at heights greater than 10 feet above ground. Whenever workers are working at heights greater than 10 feet, and are not protected by guardrails or other means of restraint, safety belts will be worn.
 
 
 11
 The Navy also had a separate contract with PRC Environmental Management, Inc. ("PRC") to provide quality assurance, technical expertise, and inspections for the asbestos removal project. PRC subcontracted with VERSAR, who supplied a full-time, on-site person to perform daily inspections.
 
 
 12
 As part of the Hunters Point project, ATG removed asbestos from an outdoor storage tank, which was 65 feet tall and encircled by two catwalks. The work proceeded in two stages. First, ATG constructed a containment barrier flush with the catwalks to prevent the release of asbestos fibers into the environment. After the barrier was completed, the actual removal process began. The site safety plan described how the asbestos was to be removed from the tower:
 
 
 13
 Waste removal from the two upper containments will be processed through a waste load out located at the upper level. The waste will then be lowered to the ground using 55 gallon drums and a sling and pulley system. Power for pulley system will be man-power using a locking 2-ton chain jack for protection against loss of control.
 
 
 14
 ATG personnel designed and implemented the sling and pulley system. They removed a section of the upper catwalk so that the asbestos could be lowered through it. The parties dispute whether the hole was necessary to implement the site safety plan. ATG says the flush containment barrier made it necessary. The Navy argues that the existing stairway openings should have been used.
 
 
 15
 After the pulley assembly and the containment structure were in place, removal began. The asbestos was watered down, removed from the tank, and placed in a barrel, which was then lowered by the pulley system. Shortly after the pulley system began operating, James was injured when the section of the catwalk grating on which he was standing tilted or gave way, causing him to fall through the hole in the catwalk. James fell approximately 20 feet, landing on the second catwalk and breaking his leg and heel. James received workers compensation for his injury.
 
 
 16
 The parties dispute whether the design of the pulley system was the cause of the grating failure. ATG's on-site project manager James Maffesanti testified that the accident was caused by an unauthorized modification of the pulley system, which placed excessive stress on the wire holding the grating to the catwalk, causing it to fail. He testified that on the morning of the accident Maffesanti and an ATG engineer attached the pulley to the tank and the catwalk guard rail, but photographs taken after the accident in the afternoon showed that the pulley was suspended from the center of the catwalk grating. This put the combined weight of the plaintiff, the 60 pound barrel, the 90 pound section of the removed section of grating, and a 40 to 50 pound bag of wet asbestos on the remaining section of grating. James denies moving the pulley; he speculates that it may have come undone from the tank and the railing and reattached itself to the exact center of the grating by falling laterally during the accident. The plaintiff's expert, Mr. Cramer, admits that it is not probable that the pulley could have changed positions during the fall, but asserted it was possible. The government agrees with ATG that the more likely scenario is that an ATG employee other than James relocated the pulley. In any event, it is undisputed that the pulley system, whether attached to the grating or the tank, was designed by and under the control of ATG employees.
 
 
 17
 It is also undisputed that the use of a safety belt as required by the plan would have prevented James' injuries. Even the plaintiff's own expert witness conceded that a safety belt would have provided greater safety for ATG's workers and would have "tak[en] care of the situation." Safety belts were required by the site safety plan when working near unguarded openings at heights of greater than 10 feet. ATG failed to enforce this requirement.
 
 
 18
 James sued the government in federal court under the FTCA seeking damages for the accident based on the "peculiar risk" doctrine, claiming that the government violated its non-delegable duty to exercise reasonable care to see that proper precautions were taken by ATG to prevent his fall. He further claims that the government was directly liable for his injuries because it retained control of its premises.
 
 
 19
 The government moved for summary judgment, arguing that under Privette v. Superior Court, 854 P.2d 721 (Cal.1993), its duty to provide a reasonably safe work place was delegable and that it met its duty to provide a reasonably safe work place through its delegation in the contract. The government also argued that its control did alter the duties of the principal-contractor relationship. The district court granted summary judgment to the defendant, and this timely appeal followed.
 
 JURISDICTION
 
 20
 The district court had jurisdiction pursuant to 28 U.S.C. Sec. 1346. This court has jurisdiction over the district court's final judgment under 28 U.S.C. Sec. 1291.
 
 STANDARDS OF REVIEW
 
 21
 A district court's grant of summary judgment is reviewed de novo. Jones v. Union Pac. R.R., 968 F.2d 937, 940 (9th Cir.1992). Pursuant to Federal Rule of Civil Procedure 56(c), the grant of summary judgment is reviewed to determine if, viewing the facts in the light most favorable to the nonmmoving party, there are no issues of material fact and the district court correctly applied the relevant substantive law. Tzung v. State Farm Fire & Casualty Co., 873 F.2d 1338, 1339-40 (9th Cir.1989). The mere existence of a scintilla of evidence in support of the non-moving party's position is insufficient. "[T]here must be evidence on which the jury could reasonably find for the [non-moving party]." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). We may affirm the district court's summary judgment on any ground supported by the record. See Smith v. Block, 784 F.2d 993, 996 n. 4 (9th Cir.1986).
 
 
 22
 Questions and interpretations of state law are reviewed de novo. Matter of McLinn, 739 F.2d 1395, 1397 (9th Cir.1984). A district court's application of its local rules is reviewed for an abuse of discretion. Miranda v. Southern Pac. Transp. Co., 710 F.2d 516, 521 (9th Cir.1983).
 
 DISCUSSION
 I. Peculiar Risk Liability
 
 23
 James argues that the government could not delegate all of its liability under the peculiar risk doctrine and thus remains directly liable for its failure to provide a reasonably safe workplace. We disagree.
 
 
 24
 The FTCA waives the sovereign immunity of the government for claims based on the negligent or wrongful acts of government employees. 28 U.S.C. Sec. 1346. The independent contractor exception to the FTCA provides that the government cannot be held vicariously liable for the negligence of an employee of an independent contractor. 28 U.S.C. Sec. 2671; Logue v. United States, 412 U.S. 521 (1973). Under the FTCA, the government's liability is determined "in the same manner and to the same extent as a private individual in like circumstances." 28 U.S.C. Sec. 1346(b); Kangley v. United States, 788 F.2d 533 (9th Cir.1986). Because plaintiff's accident occurred in California, this action is governed by California law. Id.
 
 
 25
 In California, the general rule is that a principal is not liable for torts committed by an independent contractor. See Van Arsdale v. Hollinger, 437 P.2d 508, 511 (Cal.1968). The peculiar risk doctrine, as described in sections 413 and 416 of the Restatement (Second) of Torts, is one of many exceptions to this general rule. However, following the California Supreme Court's recent decision in Privette v. Superior Court, 854 P.2d 721 (Cal.1993), James' peculiar risk claim cannot be sustained.
 
 A. Section 416
 
 26
 Under section 416, a principal is vicariously[1] liable for harm caused by the failure of a contractor to exercise reasonable care to take special precautions against peculiar risks--even if the principal has provided for such precautions under the contract. See, e.g., Woolen v. Aerojet Gen. Corp., 369 P.2d 708 (Cal.1962); Holman v. State, 124 Cal.Rptr. 773, 779 (Cal.Ct.App.1975); Restatement (Second) of Torts Sec. 416. In short, this duty is non-delegable. Although California formerly adhered to this rule, see, e.g., Woolen, 369 P.2d at 708-10, it reversed itself in Privette v. Superior Court, 854 P.2d 721 (Cal.1993), holding that:
 
 
 27
 When, as here, the injuries resulting from an independent contractor's performance of inherently dangerous work are to an employee of the contractor, and thus subject to workers' compensation coverage, the doctrine of peculiar risk affords no basis for the employee to seek recovery of tort damages from the person who hired the contractor but did not cause the injuries.
 
 
 28
 854 P.2d at 730. After Privette, California permits a principal to delegate its duty to provide a reasonably safe work place to a contractor, even where "peculiar risks" are involved, so long as the contractor's employees are covered by workers compensation.[2] Thus, James can no longer successfully claim that the government is liable under a theory that a duty in respect to safety is non-delegable where peculiar risks exist.
 
 B. Section 413
 
 29
 In Owens v. Giannetta-Heinrich Construction Co., 29 Cal.Rptr.2d 11, 14 (Cal.Ct.App.), rev. denied, 1994 Cal. LEXIS 3286 (Cal.1994), a California Court of Appeals suggested that even after Privette a principal may still be directly liable under section 413 of the (Second) Restatement of Torts if it fails to delegate its duty for peculiar risks in its contract. According to the Owens court:
 
 
 30
 [P]eculiar risk is not exclusively a form of vicarious liability. It may arise as a form of direct liability if the person who hires an independent contractor ... fails to provide in the contract that the contractor shall take such precautions...." Restat.2d Torts, Sec. 413. Peculiar risk liability is vicarious when injury is caused "by the failure of the contractor to exercise reasonable care to take [special] precautions, even though the employer has provided for such precautions in the contract or otherwise." Restat.2d Torts, Sec. 416.
 
 
 31
 ............................................................
 
 
 32
 ....................
 
 
 33
 * * *
 
 
 34
 It is plain from the discussion in Privette that the Supreme Court intended its holding to apply only in those situations where third-party liability is vicarious rather than direct.
 
 
 35
 29 Cal.Rptr.2d at 14 (brackets in original) (emphasis added); see also Littlefield v. United States, 927 F.2d 1099, 1103 (9th Cir.) (duty under section 413 is limited to requiring contractor to take appropriate safety measures in its contract), cert. denied, 502 U.S. 907 (1991). We assume without deciding that Owens correctly interpreted Privette.
 
 
 36
 James argues that the government caused his injuries by failing to provide a reasonably safe workplace and is, therefore, directly liable for the negligent acts. This is an overstatement of the principal's duties under section 413. Under Owen, the government is required to provide for special precautions by requiring in its contract that ATG must take appropriate safety measures. The government fulfilled this duty. The contract with ATG explicitly provided that the contractor is responsible for taking proper safety and health precautions. Moreover, the contract required ATG to submit a Site Safety Plan for the Navy's approval. The approved plan addressed the safety measures for asbestos removal at the tower, including the use of safety belts. Because the contract required ATG to take proper safety measures, the government cannot be held directly liable for ATG's negligence under section 413. Consequently, James' claim fails on this ground as well.
 
 
 37
 In sum, under current California law and the facts of this case, the government cannot be held directly or vicariously liable under the peculiar risk doctrine.
 
 
 38
 II. Liability Arising from Retention of Control
 
 
 39
 James argues next that because the government exercised control over certain details of the work duty performed, it owed him a duty of care, which it breached by failing either to inspect the catwalk or to warn that it could fail. Because the control exercised by the government was not sufficient to trigger liability under section 414 of the Restatement (Second) of Torts as interpreted by the California courts, we conclude that the district court properly determined that the government was not liable under a "control" theory.
 
 
 40
 California law provides that a principal who retains the right to control an independent contractor's performance owes a duty of reasonable care to prevent injuries to the contractor's employees. See, e.g., Austin v. Riverside Portland Cement Co., 282 P.2d 69, 73 (Cal.1955); Stilson v. Moulton-Niguel Water Dist., 98 Cal.Rptr. 914 (Cal.Ct.App.1971); see generally Restatement (Second) Torts Sec. 414. However, a principal may exercise some forms of control over the contractor's work without creating an obligation to assure the safety of the contractor's employees. For example, "the mere right to see that work is satisfactorily completed [does not] impose[ ] upon the one hiring an independent contractor the duty to assure that the contractor's work is performed in conformity with all safety provisions." Kuntz, 368 P.2d at 129; see also Safeway Stores, Inc. v. Massachusetts Bonding & Ins. Co., 20 Cal.Rptr. 820, 825 (Cal.Ct.App.1962) ("[T]he right to act did not raise the duty to act."). In addition, the principal may retain "the power to forbid [the work] being done in a manner likely to be dangerous to himself or others" without subjecting itself to liability under section 414. McDonald v. Shell Oil Co., 285 P.2d 902, 904 (Cal.1955) (citations omitted). Finally, an "owner may retain a broad general power of supervision and control as to the results of the work so as to insure satisfactory performance of the independent contract including the right to inspect, the right to make suggestions or recommendations as to details of the work, the right to prescribe alterations or deviations in the work without changing the relationship from that of owner and independent contractor or the duties arising from that relationship." Id. (citations omitted); see also Stilson v. Moulton-Niguel Water Dist., 98 Cal.Rptr. 914 (Cal.Ct.App.1971); West v. Guy F. Atkinson Co., 59 Cal.Rptr. 286 (Cal.Ct.App.1967).
 
 
 41
 Consequently, we must decide whether the control exercised by the government is of the sort that triggers liability to a contractor's employee. We conclude that the undisputed facts[3] establish that the control exercised by the United States, which concerned its efforts to ensure that ATG complied with its contractual duty to take adequate safety precautions, does not vitiate the owner-contractor relationship.
 
 
 42
 Most importantly, the Navy did not retain physical control over the tank work area; it was completely given over to ATG for the asbestos removal operation. ATG does not claim that the Navy's use of its tower prevented it from providing for adequate safety precautions for its employees. Cf. Austin, 282 P.2d at 73 (owner retained control over electrical lines). Indeed, the Navy chief engineer was not even allowed in the tower's containment area because she lacked the required training and was not medically monitored for asbestos exposure. Carver Decl. at 4-5. Consequently, this is not a situation where the employee was injured by "some condition of the owner's premises over which the owner remained in control." Safeway Stores, Inc., 20 Cal.Rptr. at 825.
 
 
 43
 In addition, the requirement that ATG submit a post-award site safety plan, subject to the approval of the government and supervision by PER and VERSAR, is not indicative of excessive control. Here, ATG supplied the direction for the plan and the Navy extended its approval. California courts have repeatedly held that a right of approval even in combination with a right to stop work or inspect does not destroy the owner-contractor relationship. See, e.g., Austin, 44 Cal.2d at 232-33; McDonald, 285 P.2d at 904; accord Bramer v. United States, 595 F.2d 1141, 1146 (9th Cir.1979) ("[It is a] well-established rule that neither the reservation of a right to inspect and approve of the work of an independent contractor nor actual inspection, even if allegedly negligent, alone subjects the government to liability.' ") (applying New Mexico law) (citing Jeffries v. United States, 477 F.2d 52, 56 (9th Cir.1973) (same) (applying Montana law); Roberson v. United States, 382 F.2d 714, 718-22 (9th Cir.1967) (same) (applying Arizona law); Kirk v. United States, 270 F.2d 110, 116-17 (9th Cir.1959) (applying Idaho law)).
 
 
 44
 Finally, the government is permitted to require compliance with safety rules without losing the protection of the owner-contractor relationship. "[A]n owner's demand that the independent contractor comply with safety regulations does not make the owner a guarantor that the regulations are, in fact, respected." Smith v. ACands, Inc., 37 Cal.Rptr.2d 457, 464 (Cal.Ct.App.1994) (citing Stanford v. City of Ontario, 101 Cal.Rptr. 97, 100-01 (Cal.1972)). Similarly, the "right to see that work is satisfactorily completed does not impose upon one hiring an independent contractor the duty to assure that the contractor's work is performed in conformity with all safety provisions." Id. (quoting Van Arsdale v. Hollinger, 437 P.2d 508 (Cal.1968)).
 
 
 45
 In sum, the undisputed facts support the district court's finding that the control exercised by the government was limited to its efforts to ensure that ATG met its contractual obligation to provide a reasonably safe work place. Under California law, these actions are insufficient to create liability as a matter of law.
 
 III. Landowner's Duty to Invitees
 
 46
 James claims that the Navy is liable because it breached its duty as a landowner to warn and protect invitees concerning hazards arising from its buildings over which it retains control. This argument is without merit.
 
 
 47
 A landowner owner owes certain duties to invitees, including the employees of an independent contractor. Florez v. Groom Devel. Co., 348 P.2d 200 (Cal.1960). "The applicable general principle is that the owner of property, insofar as an invitee is concerned, is not an insurer of safety but must use reasonable care to keep his premises in a reasonably safe condition and give warning of latent or concealed perils. He is not liable for injury to an invitee resulting from a danger which was obvious or should have been observed in the exercise of reasonable care." Id. at 204. The rule has been stated in section 343 of the Second Restatement of Torts, which was paraphrased by the California Supreme Court as follows:
 
 
 48
 Generally, the owner of property "... is under a duty to keep in safe condition all portions of premises over which he has control" and in more detail: "A possessor of land who knows or reasonably should know, of a natural or artificial condition upon his premises which he should foresee, exposes his business visitors to an unreasonable risk, and who has no basis for believing that they will discover the condition or realize the risk involved there, is under a duty to exercise ordinary care either to make the condition reasonably safe for their use or to give warning adequate to enable them to avoid the harm."
 
 
 49
 Austin, 828 P.2d at 73 (citations omitted).
 
 
 50
 We find that the government has met its duty to its business invitees. The Navy took reasonable steps to protect ATG's employees. Its contract made ATG responsible for safety during the project. In its work plan, the Navy warned ATG of the danger of working on tall towers outdoors and directed ATG to take appropriate precautions. Furthermore, it required ATG to submit a site safety plan for its approval. The approved plan mandated the use of safety belts when working near unguarded holes at heights of greater than 10 feet. There is no evidence that the Navy was aware that an unguarded hole had been created in the catwalk; the site safety plan did not explicitly call for a hole, and one had not been mentioned in the daily reports. In addition, the Navy had hired specialists to inspect ATG's operations, and there is no evidence that the inspections were deficient or had revealed a dangerous condition on the catwalk. Cf. Holman, 124 Cal.Rptr. at 781-85. Finally, the Navy could not foresee that ATG would breach its contractual duty to require the use of safety belts. See Austin, 828 P.2d at 73; accord Poston v. United States, 396 F.2d 103, 107-08 (9th Cir.) (applying Hawaii law), cert. denied, 393 U.S. 946 (1968).
 
 
 51
 None of the cases cited by James, all of which predate the Privette decision, require a contrary result. In Kuntz v. Del E. Webb Constr. Co., 368 P.2d 127, 130-31 (Cal.1961), the general contractor knew of a dangerous condition, but took no corrective steps and did not warn others of the danger. In Florez v. Groom Development Co., 348 P.2d 200, 205 (Cal.1959), the general contractor created a dangerous condition and failed to correct it or warn an invitee not to use it. Finally, in Biondini v. Amship Corp., 185 P.2d 94, 102-03 (Cal.Dist.Ct.App.1947), the court found that a general contractor could breach its duty to exercise ordinary care by erecting faulty scaffolding and failing to make any effort to ascertain whether the scaffolding was suitable or safe for use by a subcontractor's employees.
 
 
 52
 We hold that the government did not breach its duty of care owed to James as an invitee on its property.
 
 
 53
 IV. Failure to Allow Surrebuttal or Oral Argument
 
 
 54
 James claims that the district court erred by not giving him an opportunity to respond to "new" evidence in the government's reply brief supporting its summary judgment motions below. This argument is without merit for several reasons.
 
 
 55
 First, even assuming that the reply brief raised "new issues," James waived his right to respond to or strike the material by failing to raise the issue below. See, e.g., United States v. One 1978 Piper Cherokee Aircraft, 37 F.3d 489, 494 (9th Cir.1994), petition for cert. filed, (U.S. Jan. 22, 1995). Second, it is not apparent that the issues raised were, in fact, newly raised by the government's reply brief. To the contrary, it appears that the government was merely responding to a "control" argument raised by James in his opposition brief, and such response arguments are permissible in reply. Finally, to the extent that James' argument rests on the district court's decision to forego oral argument, his claim must fail. The district court acts well within its discretion under its local rules when it determines that oral argument would not be helpful. See Miranda v. Southern Pac. Transp. Co., 710 F.2d 516, 521 (9th Cir.1983) ("District courts have broad discretion in interpreting and applying their local rules.").
 
 CONCLUSION
 
 56
 The government is not liable for James' injuries unless it owed him a duty of care that it breached. Here the government properly delegated its duty to provide a safe workplace to its independent contractor, James' employer. Furthermore, the government did not breach any duty it owed to invitees as a landowner because it did not retain control over the work area and took appropriate precautions by requiring the contractor to prevent injuries from falls from high towers. Finally, we conclude that the district court acted within its discretion by declining to hear oral argument; the plaintiff's claim for a surrebuttal below was waived for failure to raise the issue before the district court. We affirm the decision of the district court to dismiss James' action on summary judgment.
 
 
 57
 AFFIRMED.
 
 NOONAN, Circuit Judge, concurring:
 
 58
 I concur in the result.
 
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3
 
 
 [1]
 Under the FTCA, the government may not be held vicariously liable. 28 U.S.C. Sec. 2671. However, section 416 liability has been construed as creating direct liability from the government's nondelegable duty to ensure that the contractor employs proper safety procedures. See McGarry v. United States, 549 F.2d 587, 590 (9th Cir.1976), cert. denied, 434 U.S. 922 (1977)
 
 
 [2]
 In California, an employee eligible for coverage is covered by workers compensation even if the employer is uninsured. See Privette, 854 P.2d at 726-27 (citing Cal.Labor Code Sec. 3716 (creating benefit fund to provide benefits for employees of uninsured employers))
 
 
 [3]
 James argues that the declaration of its expert witness, Mr. Cramer, creates a dispute as to material fact as to whether the government exercised control over the project. Based on his review of the evidence, Mr. Cramer declared that the government retained a substantial degree of control over the project and that the site safety plan was inadequate and contributed to James' accident. However, Mr. Cramer's declaration does not create an issue of material fact for three reasons. First, the control he describes is not sufficient to alter the principal-contractor relationship. His conclusion that the government exercised substantial control appears to be premised on the defendant's efforts to ensure ATG's compliance with its duty to provide a reasonably safe workplace. Such control does not trigger section 414 liability. See, e.g., McDonald, 285 P.2d at 904. Second, Mr. Cramer acknowledges that the government relinquished control of the catwalk to ATG. He concludes that "[i]n failing to manage its property, specifically the permanent catwalk, it UNITED STATES [sic] exposed MR. JAMES to injury." These statements are consistent with the district court's findings of control on summary judgment. Third, his finding that the site safety plan was a cause of the accident implicates ATG, which authored the plan and was ultimately responsible for site safety, not the Navy. Accordingly, we conclude that the Cramer declaration did not create a material issue of fact that would preclude summary judgment for the defendant