[No. B162614. Second Dist., Div. Four. Nov. 26, 2003.]

JIMMY SHEELER et al., Plaintiffs and Appellants, v.
GREYSTONE HOMES, INC., Defendant and Respondent.

**COUNSEL**

Rose, Klein & Marias, Richard G. Barone, David A. Rosen and Arlyn M. Latin for Plaintiffs and Appellants.

Jones, Hirsch, Connor & Bull, Michael B. Magloff and Pamela Sirkin for Defendant and Respondent.

## OPINION

**CURRY, J.**—Summary judgment was granted in favor of defendant and respondent Greystone Industries, Inc. (Greystone) and against plaintiffs and appellants Jimmy and Esther Sheeler. We affirm.

## RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

The following facts are not in dispute: In February 2000, Jimmy Sheeler was an experienced masonry and tile worker with 30 years of experience. At the time, he was an employee of Roy Gerbitz Tile, a subcontractor at a construction site in Stevenson Ranch. Greystone was the general contractor at the site. On February 2, 2000, Sheeler was injured at the site. As a result of his injuries, he received workers' compensation benefits.

On September 29, 2000, the Sheelers filed a complaint against Greystone, containing a negligence claim by Jimmy Sheeler, and a claim for loss of consortium by Esther Sheeler. The complaint alleged that Greystone negligently failed to "coordinate, construct, inspect, maintain, clean, protect, manage, control, and supervise the job site by allowing construction debris and other material to remain on" a staircase, and as a result, Sheeler tripped on debris while climbing the staircase.

On April 8, 2002, Greystone filed a motion for summary judgment, contending that Greystone was not liable for Jimmy Sheeler's injuries under any theory of negligence permitted under *Privette v. Superior Court* (1993) 5 Cal.4th 689 [21 Cal.Rptr.2d 72, 854 P.2d 721] (*Privette*) and its progeny, and thus Esther Sheeler's claim for loss of consortium also failed as a matter of law. Following a hearing, the trial court granted Greystone's motion, and judgment was entered on September 25, 2002.

## DISCUSSION

The Sheelers contend that the trial court erred in granting summary judgment.

### A. *Standard of Review*

Summary judgment is reviewed de novo. (*Lunardi v. Great-West Life Assurance Co.* (1995) 37 Cal.App.4th 807, 819 [44 Cal.Rptr.2d 56].)

"A defendant is entitled to summary judgment if the record establishes as a matter of law that none of the plaintiff's asserted causes of action can prevail. [Citation.]" (*Molko v. Holy Spirit Assn.* (1988) 46 Cal.3d 1092, 1107 [252 Cal.Rptr. 122, 762 P.2d 46].) In moving for summary judgment, "all that the defendant need do is to show that the plaintiff cannot establish at least one element of the cause of action—for example, that the plaintiff cannot prove element X." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 853 [107 Cal.Rptr.2d 841, 24 P.3d 493], fn. omitted.) Nonetheless, all doubts as to whether there are any triable issues of fact are to be resolved in favor of the party opposing summary judgment. (*Barber v. Marina Sailing, Inc.* (1995) 36 Cal.App.4th 558, 562 [42 Cal.Rptr.2d 697].)

Here, the Sheelers contend that there are triable issues of fact as to whether Greystone is liable for Jimmy Sheeler's injuries under theories of direct negligence and premises liability.[1] They argue that Greystone had a direct or nondelegable duty to ensure the safety of his worksite, and there is evidence that Greystone affirmatively breached this duty, thereby causing his injuries. As we explain below, they are mistaken.

### B. *Privette And Its Progeny*

In *Privette* and subsequent cases, our Supreme Court has clarified the theories under which an employee of an independent contractor may assert a claim sounding in negligence against the independent contractor's hirer when, as here, the employee has recovered workers' compensation benefits for the injuries in question. We therefore begin with a discussion of these cases.

"At common law, a person who hired an independent contractor generally was not liable to third parties for injuries caused by the contractor's negligence in performing the work." (*Privette, supra,* 5 Cal.4th at p. 693.) Nonetheless, prior to *Privette,* the courts had developed numerous exceptions to this rule. (*Ibid.*)

*Privette* addressed the exception founded on the doctrine of "peculiar risk,"[2] which permits parties injured by an independent contractor's inherently dangerous work to seek tort damages from the independent contractor's hirer. (Rest.2d Torts, §§ 413, 416.) Under this doctrine, when the hirer fails to ensure by contract or other means that special precautions will be taken, the hirer may be *directly* liable for injuries arising from the inherently dangerous

---

[1] The Sheelers do not dispute that Esther Sheeler's claim for loss of consortium fails as a matter of law if Jimmy Sheeler's negligence claim is untenable. (*Jablonski v. Royal Globe Ins. Co.* (1988) 204 Cal.App.3d 379, 388 [251 Cal.Rptr. 160].)

[2] A peculiar risk is "a special, recognizable danger arising out of the work itself." (Rest.2d Torts, § 413, com. b, p. 386.)

work. (Rest.2d Torts, § 413.) Furthermore, even if the hirer provides for special precautions by contract or otherwise, the doctrine holds that the hirer may be *vicariously* liable for injuries arising from the independent contractor's negligent failure to take these precautions. (Rest.2d Torts, § 416.)

*Privette* confronted an issue at the intersection of the peculiar risk doctrine and the statutory scheme governing workers' compensation, namely, whether the doctrine permits an independent contractor's employee to bring an action against the independent contractor's hirer. (*Privette, supra,* 5 Cal.4th at pp. 693–702.) In *Privette,* the employee of an independent contractor injured himself while he was carrying hot tar to a duplex's roof. (*Id.* at p. 692.) The employee sought workers' compensation benefits, and also sued the duplex owner under the peculiar risk doctrine. (*Ibid.*)

The court in *Privette* held that employees may not recover under this doctrine for injuries subject to workers' compensation coverage. (*Privette, supra,* 5 Cal.4th at pp. 696–702.) It observed that the workers' compensation scheme precludes a tort action by the employee against the independent contractor. (*Id.* at pp. 696–698.) Moreover, it reasoned that peculiar risk "is in effect a form of vicarious liability," notwithstanding "the characterization of the doctrine as 'direct' liability" in some situations. (*Id.* at p. 695 & fn. 2.) Accordingly, it concluded that permitting the employee to recover damages from the duplex owner would unfairly expose a nonnegligent party that had hired an independent contractor to greater liability for damages than the negligent independent contractor. (*Id.* at pp. 695, fn. 2, 696–702.)

Subsequently, in *Toland v. Sunland Housing Group, Inc.* (1998) 18 Cal.4th 253, 269–270 [74 Cal.Rptr.2d 878, 955 P.2d 504] *(Toland),* the Supreme Court clarified that *Privette* bars all actions against a hirer by an independent contractor's employee under the peculiar risk doctrine, provided that the relevant injuries are subject to workers' compensation coverage. In *Toland,* a subcontractor's employee was injured at a construction site when a large wall collapsed on him. (*Id.* at p. 257.) The employee brought a negligence action against the general contractor under the peculiar risk doctrine, alleging that the general contractor was directly liable for his injuries through a failure to require special safety precautions. (*Ibid.*)

The court in *Toland* held that *Privette* precludes peculiar risk claims against the hirer, regardless of whether they rest on direct or vicarious liability under the doctrine. (*Toland, supra,* 18 Cal.4th at pp. 269–270.) It reasoned that within this doctrine, each form of liability "is in essence 'vicarious' or 'derivative' in the sense that it derives from the 'act or omission' of the hired contractor, because it is the hired contractor who has caused the injury by failing to use reasonable care in performing the work."

(*Id.* at p. 265.) The *Toland* court thus concluded that under either alternative, "it would be unfair to impose liability on the hiring person when the liability of the contractor, the one primarily responsible for the worker's on-the-job injuries, is limited to providing workers' compensation coverage." (*Id.* at p. 267.)

In *Camargo v. Tjaarda Dairy* (2001) 25 Cal.4th 1235 [108 Cal.Rptr.2d 617, 25 P.3d 1096] (*Camargo*), the Supreme Court extended *Privette* and *Toland* to claims of negligent hiring by the hirer. (Rest.2d Torts,§ 411). In *Camargo*, an employee of an independent contractor hired to remove manure from a dairy's corrals died when his tractor overturned as he scraped manure. (*Camargo, supra*, 25 Cal.4th at p. 1238.) The employee's relatives sued the dairy on the theory that it was negligent in hiring the independent contractor, alleging that the dairy had failed to determine the decedent's competence to drive a tractor. (*Ibid.*)

The court in *Camargo* noted that the theory of negligent hiring involves an assertion of direct liability, but nonetheless held that the employee's claim failed under the rationale in *Privette* and *Toland*. (*Camargo, supra*, 25 Cal.4th at pp. 1244–1245.) It reasoned that the hirer's direct liability under the theory of negligent hiring, like the hirer's direct liability under the peculiar risk doctrine, is effectively vicarious or derivative because it derives from an act or omission by the independent contractor. (*Id.* at p. 1244.)

In *Hooker v. Department of Transportation* (2002) 27 Cal.4th 198 [115 Cal.Rptr.2d 853, 38 P.3d 1081] (*Hooker*) and *McKown v. Wal-Mart Stores, Inc.* (2002) 27 Cal.4th 219 [115 Cal.Rptr.2d 868, 38 P.3d 1094] (*McKown*), the Supreme Court limited the reach of *Privette*, *Toland*, and *Camargo*. In *Hooker*, the California Department of Transportation (Caltrans) hired a general contractor to build an overpass. (*Hooker, supra*, 27 Cal.4th at p. 202.) Caltrans was responsible for ensuring compliance with safety laws and regulations at the construction site, and it retained authority to monitor and correct safety hazards. (*Ibid.*) During construction, a crane operator moved the crane's outriggers to permit vehicles to pass, and then he failed to restore the outriggers to the position needed to stabilize the crane. (*Ibid.*) The crane overturned, killing the operator. (*Ibid.*)

The operator's widow initiated an action against Caltrans, alleging that it had negligently exercised the control that it had retained over the construction site. (*Hooker, supra*, 27 Cal.4th at p. 203.) Under this theory, "[o]ne who entrusts work to an independent contractor, but who retains the control over any part of the work, is subject to liability for physical harm to others for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care." (Rest.2d Torts, § 414.)

The court in *Hooker* held that when the hirer has "*exercised* the control that was retained in a manner that *affirmatively* contributed to the injury of the contractor's employee," a claim based on negligent exercise of retained control escapes *Privette*, *Toland*, and *Camargo*. (*Hooker, supra*, 27 Cal.4th at pp. 210–212.) It reasoned: "Imposing tort liability on a hirer of an independent contractor when the hirer's conduct has affirmatively contributed to the injuries of the contractor's employee is consistent with the rationale of our decisions in *Privette*, *Toland* and *Camargo* because the liability of the of the hirer in such a case is *not* ' "in essence 'vicarious' or 'derivative' in the sense that it derives from the 'act or omission' of the hired contractor." ' [Citation.] To the contrary, the liability of the hirer in such a case is *direct* in a much stronger sense of that term." (*Hooker, supra*, 27 Cal.4th at pp. 211–212, fn. omitted.)

Regarding the requisite affirmative contribution, the court in *Hooker* pointed with favor to *Kinney v. CSB Construction, Inc.* (2001) 87 Cal.App.4th 28, 39 [103 Cal.Rptr.2d 594], in which the court stated: " '[A] general contractor owes no duty of care to an employee of a subcontractor to prevent or correct unsafe procedures or practices to which the contractor did not contribute by direction, induced reliance, or other affirmative conduct. The mere failure to exercise a power to compel the subcontractor to adopt safer procedures does not, without more, violate any duty owed to the plaintiff.' " (*Hooker, supra*, 27 Cal.4th at p. 209.)

In addition, the *Hooker* court explained: "Such affirmative contribution need not always be in the form of actively directing a contractor or contractor's employee. There will be times when a hirer will be liable for its omissions. For example, if the hirer promises to undertake a particular safety measure, then the hirer's negligent failure to do so should result in liability if such negligence leads to an employee injury." (*Hooker, supra*, 27 Cal.4th at p. 212, fn. 3 [115 Cal.Rptr.2d 853, 38 P.3d 1081] .)

Turning to the facts in *Hooker*, the Supreme Court concluded that Caltrans was not liable for the crane operator's death. (*Hooker, supra*, 27 Cal.4th at pp. 214–215.) Although Caltrans had permitted traffic to flow past the crane, thereby requiring the crane operator to move the outriggers from time to time, the *Hooker* court stated: "[T]here was no evidence Caltrans's exercise of retained control over safety conditions at the worksite affirmatively contributed to the adoption of that practice by the crane operator. There was, at most, evidence that Caltrans's safety personnel were aware of an unsafe practice and failed to exercise the authority they retained to correct it." (*Id.* at p. 215.)

Finally, in *McKown, supra,* 27 Cal.4th at page 223, an employee of a subcontractor was injured while using a forklift supplied by the subcontractor's hirer. The court in *McKown* concluded that *Privette* and its progeny did not preclude the employee from asserting a claim against the hirer for negligent provision of unsafe equipment. (*Id.* at pp. 225–226.) Citing *Hooker,* it reasoned that "when a hirer . . . , by negligently furnishing unsafe equipment to the contractor, affirmatively contributes to the injury of an employee of the contractor, the hirer should be liable to the employee for the consequences of the hirer's own negligence." (*Id.* at p. 225.)

### C. *Parties' Showings*

On summary judgment, Greystone submitted deposition testimony from Jimmy Sheeler about the circumstances of his injury. According to Jimmy Sheeler, he arrived at the worksite early on February 2, 2000, with his supervisor, Eric, who told him that they were to tile a second-story bathroom. Sheeler went upstairs to the bathroom and saw no debris on the stairs. He also noticed someone whom he described as a "Hispanic man" sweeping the second-story floor with a push broom.

Sheeler then went downstairs to his vehicle and retrieved a tile saw that he intended to carry up the stairs to the bathroom. When he again approached the stairs, the man he had previously seen was standing in front of the first step on the ground level, leaning on his broom. As Sheeler ascended the steps, the tile saw blocked his view of his feet. He slipped near the top of the steps and fell, injuring himself. As he fell, he heard a piece of wood hit the wall. Sheeler believed that he had slipped on this piece of wood, and that the man with the broom had swept it onto the stairs.

Greystone also submitted deposition testimony from John Stoneman, Greystone's project superintendent, regarding its responsibilities for safety. According to Stoneman, no one employed by Greystone was responsible for inspecting the homes under construction on a daily basis to ensure that they were safe for the next subcontractor. Nonetheless, he testified that it was up to him, "in a secondary capacity," to make sure the job was safe. In this capacity, he enforced OSHA safety guidelines, held weekly safety meetings, and scheduled cleanups. He was on the site on a daily basis, and he abated hazards of which he was aware.

Regarding cleanups, Stoneman testified that subcontractors were obliged to bundle up and remove their trash, but not to sweep up residual debris. Greystone had a subcontractor whom Stoneman called upon to conduct cleanups or "sweeps" at various times in the construction process.

According to Stoneman's records, the following work was done in the unit in which Jimmy Sheeler was injured prior to his accident. on February 2,

2002: cabinets, stairs, and railings were installed on January 26, 2000; the unit was painted on January 27, 2000; the unit was again painted on January 29, 2000; and Roy Gerbitz Tile began its work on January 28, 2000. The records indicated no activity in the unit between January 30 and February 1, 2000. Stoneman believed that the units were swept prior to the painting on January 27 and 29, 2000.

In response to questioning about whether the sweeping was "scheduled in order to ensure safety," Stoneman answered: "*No.* The sweeping was scheduled to allow me to paint. It has a bifold purpose, though. The units are dirty after they install the doorways and the cabinets, and so it is swept out at that point. That makes it clean and it also allows me to paint." (Italics added.)

The following dialogue then occurred:

"Mr. Magloff [Greystone's counsel]: And does [sweeping] also make it safe?

"The Witness: Like I said, it's so relative. You could be jumping over an open trench to get to the unit. I mean, you know, it is a construction site. They can be pouring concrete at the front of the unit. Or they can be placing rebar."

Quibbles aside,[3] the Sheelers did not challenge much of this factual showing. Regarding Jimmy Sheeler's accident, they conceded as undisputed that they did not know the identity of the man with the broom whom Sheeler had seen or the man's employer. However, they pointed to evidence suggesting that the piece of wood that Jimmy Sheeler saw after his fall resembled wood used by cabinet and railing installers.

Regarding the sweeps, the Sheelers observed that Stoneman's records did not identify their dates.[4] On this matter, Stoneman testified that he did not

---

[3] ▪ The Sheelers repeatedly tried to raise disputes about facts supported by testimony from Jimmy Sheeler or Stoneman, without pointing to evidence or inferences that challenged the alleged facts. In this regard, they relied on the principle that the trial court may not weigh a witness's credibility on summary judgment. However, the trial court may properly grant summary judgment on the basis of a single witness's testimony, in the absence of conflicting evidence or inferences. (*Allen v. McMillion* (1978) 82 Cal.App.3d 211, 215, fn. 2 [147 Cal.Rptr. 77]; Code Civ. Proc., § 437c, subd. (e).)

[4] The Sheelers also contended that Carlos Lopez, an employee of Greystone's cleanup subcontractor, testified that he had no records of the last sweep in the relevant unit before Jimmy Sheeler was injured. However, the cited excerpts from Lopez's deposition contain no such testimony.

note the dates of sweeps in his records, but he always scheduled sweeps before painting to prevent debris and dirt from ruining the paintwork.[5]

Finally, the Sheelers submitted deposition testimony from Timothy Hayes, an assistant construction manager for Greystone at the construction site. Hayes stated that his duties included calling the cleanup subcontractor to schedule cleanups. He also stated that safety meetings were held every 10 days for Greystone employees, and that if he saw a safety hazard on the site, he would abate the hazard or inform Stoneman about it. Greystone did not raise material disputes about Hayes's testimony.

## D. *Negligence*

The Sheelers contend that there are triable issues as to whether Greystone is liable in negligence for Jimmy Sheeler's injuries. They argue that (1) the situation here falls outside the limitations on hirer liability in *Privette* and its progeny, and (2) even if these limitations are applicable, triable issues exist regarding Greystone's liability under the theory of negligent exercise of retained control. As we explain below, both contentions are mistaken.

Regarding item (1), the Sheelers contend that a key element of the rationale established in *Privette*, and subsequently extended in *Toland*, *Camargo*, and *Hooker*, is absent. They argue that, unlike the situations in these cases, Jimmy Sheeler's injuries are not traceable to negligence by his own employer, Roy Gerbitz Tile.

We reject this contention for two reasons. ■ First, under common law, an employer is liable in negligence for an employee's injuries arising when the employee "comes into a position of imminent danger of serious harm" known to the employer, and the employer fails to take reasonable steps to avert the danger. (Rest.2d Torts, § 314B(1).) Here, the evidence before us establishes that Eric, Jimmy Sheeler's supervisor at Roy Gerbitz Tile, permitted Sheeler to carry a large tile saw unassisted up the stairs, even though the saw blocked Sheeler's view of his own feet.

■ Second, even if Jimmy Sheeler's injuries were not the result of his employer's negligence, it appears that *Privette* and its progeny preclude the imposition of liability under the circumstances of this case. In *Smith v.*

---

[5] The Sheelers also objected to Stoneman's records as hearsay. The trial court did not expressly rule on this objection, but stated that it had considered "only admissible evidence." In our view, the trial court could have properly concluded that the records were admissible as a business record, given Stoneman's testimony that he personally prepared these records on or about February 2, 2000, as part of his normal duties as job superintendent. (1 Witkin, Cal. Evidence (4th ed. 2000) Hearsay, §§ 226–227, pp. 943–945; Evid. Code, § 1271.)

*ACandS, Inc.* (1994) 31 Cal.App.4th 77, 82–85 [37 Cal.Rptr.2d 457], a utility company hired independent contractors to perform pipe work at its plants. A pipe fitter employed by these independent contractors was exposed to airborne asbestos kicked up by the activities of other independent contractors working at the plants. (*Id.* at pp. 85–86.) When the pipe fitter developed asbestosis, he brought an action against the utility company on the theory that it was vicariously liable for hiring subcontractors whose work created a peculiar risk to others. (*Id.* at p. 82.)

After a jury returned a verdict in the pipe fitter's favor, the court in *Smith* reversed, concluding that the jury erred in imposing vicarious liability on the utility company under a theory of peculiar risk. (*Smith v. ACandS, Inc., supra,* 31 Cal.App.4th at pp. 94–97.) In so concluding, it rejected the pipe fitter's contention that his situation fell outside *Privette* because his injuries were due to neighboring contractors, and not his own employer. (*Id.* at pp. 96–97.) It reasoned that the *Privette* rationale governed, notwithstanding the absence of negligence by the pipe fitter's own employer. (*Ibid.*)

*Smith* was subsequently disapproved in part in *Camargo*, but not on grounds that undermine this reasoning.[6] In *Camargo*, a party argued that *Smith* stood for the proposition that an employee of an independent contractor may assert a negligent hiring claim against the hirer of the independent contractor. (*Camargo, supra,* 25 Cal.4th at pp. 1242–1243.) The *Camargo* court examined *Smith* and expressly stated that *Smith* did *not* stand for that proposition, but it nonetheless disapproved *Smith* to the extent that *Smith* might conflict with its conclusion that *Privette* barred such negligent hiring claims. (*Camargo, supra,* at pp. 1243–1245.) Because the court in *Camargo* did not criticize the holding in *Smith*, it remains good law on the question before us. In view of *Smith*, we reject the Sheelers' contention that the case before us falls outside of *Privette* and its progeny.

Regarding item (2), the Sheelers contend that triable issues exist regarding whether Greystone is liable for Jimmy Sheeler's injuries on the theory of negligent exercise of retained control. They argue that there is sufficient

---

[6] Our Supreme Court's decisions bind us, and its dicta command our serious respect. (*Bunch v. Coachella Valley Water Dist.* (1989) 214 Cal.App.3d 203, 212 [262 Cal.Rptr. 513]; *People v. Jackson* (1979) 95 Cal.App.3d 397, 402 [157 Cal.Rptr. 154].) However, "language contained in a judicial opinion is ' "to be understood in the light of the facts and issue then before the court, and an opinion is not authority for a proposition not therein considered. [Citation.]" ' [Citations.]" (*People v. Banks* (1993) 6 Cal.4th 926, 945 [25 Cal.Rptr.2d 524, 863 P.2d 769].) When questions about an opinion's import arise, the opinion "should receive a reasonable interpretation [citation] and an interpretation which reflects the circumstances under which it was rendered [citation]" (*Young v. Metropolitan Life Ins. Co.* (1971) 20 Cal.App.3d 777, 782 [98 Cal.Rptr. 77]), and its statements should be considered in context (see *Pullman Co. v. Industrial Acc. Com.* (1946) 28 Cal.2d 379, 388 [170 P.2d 10]).

evidence that Greystone retained control over a facet of safety operations, namely, the scheduling of cleanups; that Greystone negligently scheduled a cleanup at the same time that Jimmy Sheeler was to work in the unit, rather than before he commenced this work; and that Greystone's cleanup contractor negligently swept debris onto the stairs, thereby causing Jimmy Sheeler's injuries. We disagree.

■ Under *Hooker*, the key question is whether Greystone "*exercised* the control that was retained in a manner that *affirmatively* contributed to the injury of the contractor's employee." (*Hooker, supra,* 27 Cal.4th at pp. 210–212.) To begin, there is no evidence that Greystone exercised its retained control over the site by scheduling cleanups *solely* to ensure safety. According to Stoneman, the sweeps in the relevant unit prior to the accident were scheduled to facilitate painting. He acknowledged that cleanups also enhanced safety, but testified that they were not scheduled to serve this end alone, and that they did not guarantee safety. Thus, much as in *Hooker*, the record establishes that Greystone *could* have scheduled cleanups solely to ensure or guarantee safety, but it never promised to do so, or otherwise established a practice of doing so.

There is also no evidence that Greystone affirmatively contributed to Jimmy Sheeler's injuries on February 2, 2000. Nothing suggests that Greystone scheduled a sweep to occur while Roy Gerbitz Tile was working in the unit. The only evidence on this matter again comes from Stoneman, who testified solely that he had scheduled sweeps prior to the painting on January 27 and 29, 2000.

Moreover, there is no evidence that the man with the broom in the unit was in fact employed by Greystone's cleanup subcontractor. The Sheelers conceded that they did not know the identity of this man or his employer.[7] In any event, nothing indicates that Greystone exercised any control over the manner in which this man swept the unit, and thus a claim of negligent exercise of retained control fails for want of a triable issue on this point. (Rest.2d Torts, § 414.)

The Sheelers disagree, citing *Ray v. Silverado Constructors* (2002) 98 Cal.App.4th 1120 [120 Cal.Rptr.2d 251]. However, this case is factually

---

[7] During oral argument, the Sheelers' counsel argued for the first time that one could reasonably infer that the cleanup subcontractor had employed the man with the broom from the size of the broom. However, the evidence cited in support of this inference was never brought to the trial court's attention prior to its ruling on the motion for summary judgment. Summary judgment will not be reversed upon the basis of such evidence. (*North Coast Business Park v. Nielsen Construction Co.* (1993) 17 Cal.App.4th 22, 30–32 [21 Cal.Rptr.2d 104]; *San Diego Watercrafts, Inc. v. Wells Fargo Bank* (2002) 102 Cal.App.4th 308, 315–316 [125 Cal.Rptr.2d 499].) For similar reasons, we also disregard novel factual contentions first raised in the Sheelers' reply brief.

distinguishable. In *Ray*, a road authority hired a general contractor to build a stretch of road, and the general contractor in turn engaged a subcontractor to build several bridges. (*Id.* at pp. 1123–1124.) The subcontract between the general contractor and subcontractor prohibited the subcontractor from erecting traffic barricades without the general contractor's permission. (*Id.* at pp. 1132–1133.) When high winds kicked up, an employee of the subcontractor was killed by flying construction materials as he tried to clear hazardous wind-blown debris from traffic lanes. (*Id.* at p. 1124.)

The court in *Ray* reversed summary judgment on the negligence claims filed by the decedent's wife against the road authority and general contractor. (*Ray v. Silverado Constructors, supra*, 98 Cal.App.4th at pp. 1139–1140.) It concluded that there were triable issues regarding whether they were liable for the employee's death under *Hooker*, given the subcontract provisions placing traffic control in the general contractor's hands, and the evidence indicating that the general contractor had not exercised this control, despite the obvious dangers posed by the high winds. (*Id.* at pp. 1133–1139.) The *Ray* court observed that on this evidence, a reasonable jury could have concluded that had traffic been halted, the employee would not have entered the traffic lanes to protect other people from debris. (*Id.* at pp. 1137–1138.)

By contrast with *Ray*, nothing obligated Greystone to schedule cleanups to ensure safety. Furthermore, it is undisputed that Greystone was unaware of the debris on the stairs that may have caused Jimmy Sheeler's accident. Accordingly, the case before us falls outside the scope of *Ray*.

### E. *Nondelegable Duty*

Finally, the Sheelers contend that notwithstanding *Privette* and its progeny, Greystone is liable for Jimmy Sheeler's injuries on a theory of premises liability. Citing primarily *Delgado v. W. C. Garcia & Associates* (1963) 212 Cal.App.2d 5 [27 Cal.Rptr. 613], they argue that Greystone had a nondelegable duty to ensure the safety of the premises upon which Jimmy Sheeler worked. Again, we disagree.

Recovery on a theory of premises liability is generally limited to situations in which injury arises from an unobvious and preexisting condition on the land. (*Elder v. Pacific Tel. & Tel. Co.* (1977) 66 Cal.App.3d 650, 661–662 [136 Cal.Rptr. 203].) However, a landowner or general contractor may be liable even for injuries arising from an obvious preexisting condition on the land when such injuries are foreseeable. (*Osborn v. Mission Ready Mix* (1990) 224 Cal.App.3d 104, 114–122 [273 Cal.Rptr. 457].)

In the present context, applying the nondelegable duty rule to the theory of premises liability cannot be reconciled with *Privette* and its progeny. As the

court explained in *Srithong v. Total Investment Co.* (1994) 23 Cal.App.4th 721, 727 [28 Cal.Rptr.2d 672], "the nondelegable duty rule is a form of *vicarious liability* because it is not based on the personal fault of the landowner who hired the independent contractor." (Italics added.) For this reason, the nondelegable duty rule is incompatible with the limitations on hirer liability established in *Privette* and subsequent cases. (*Lopez v. University Partners* (1997) 54 Cal.App.4th 1117, 1129 [63 Cal.Rptr.2d 359].)

*Delgado* and the other cases cited by the Sheelers are not persuasive on the issue before us. They predate *Privette* and do not address the rationale stated in *Privette* and elaborated in its progeny. ▮ Accordingly, under *Hooker* and *McKown*, we conclude that an employee cannot recover under the theory of premises liability unless the hirer had control of the dangerous condition and affirmatively contributed to the employee's injury.[8]

Here, the evidence unequivocally discloses that Greystone enforced compliance with OSHA safety regulations, and its supervisors, who were present on a daily basis, abated hazards when they were aware of them. Furthermore, nothing suggests that Greystone had notice of the piece of wood that may have caused Jimmy Sheeler's accident.

The record also establishes that the unit was swept twice after the cabinet installers performed their work, indicating that the piece of wood upon which Jimmy Sheeler slipped was overlooked by the cleanup workers, or inadvertently placed on the stairs by the man with the broom on February 2, 2000. However, as we have explained (see pt. C., *ante*), there is no evidence that Greystone itself affirmatively contributed to Jimmy Sheeler's injuries.

Summary judgment was therefore proper.

---

[8] We observe that in *Kinsman v. Unocal Corp.* (2003) 110 Cal.App.4th 826 [2 Cal.Rptr.3d 87], review granted October 29, 2003, S118561, the court addressed a claim against a hirer based on premises liability, and concluded that the limitations on hirer liability in *Privette* and its progeny apply even when injuries to a subcontractor's employee are not the result of the subcontractor's own negligence, but arise from the activities of neighboring subcontractors.

## DISPOSITION

The judgment is affirmed.

Vogel (C.S.), P. J., and Epstein, J., concurred.